107 Cal.Rptr.2d 187 (2001)
88 Cal.App.4th 1268
Cimmaron OLSZEWSKI, A Minor, etc., Plaintiff and Appellant,
v.
SCRIPPSHEALTH et al., Defendants and Respondents.
No. D034197.
Court of Appeal, Fourth District, Division One.
May 9, 2001.
Rehearing Denied June 7, 2001.
Review Granted August 29, 2001.
*190 Chavez & Gertler, Mark A. Chavez, Kim E. Card, San Francisco; Blumenthal, Ostroff & Markham, Sheldon A. Ostroff, David R. Markham, San Diego; Law Offices of Thomas J. Brandi and Thomas J. Brandi, San Francisco, for Plaintiff and Appellant.
Manjusha P. Kulkarni, for National Health Law Program as Amicus Curiae on behalf of Plaintiff and Appellant.
Friestad & Giles and Deborah Giles, San Diego, for Defendant and Respondent ScrippsHealth.
*191 Gary M. Orlansky, for Defendant and Respondent Medical Liability Recoveries, Inc.
Stream & Stream, Theodore K. Stream, Jamie E. Wrage, Riverside, and Tera Harden, for Loma Linda University Medical Center, Inc. as Amicus Curiae on behalf of Defendants and Respondents.
Manatt, Phelps & Phillips, Barry S. Landsberg, Harvey L. Rochman and Wendy M. Conole, Los Angeles, for Catholic Healthcare West as Amicus Curiae on behalf of Defendants and Respondents.
McDONALD, J.
When a person eligible for Medi-Cal benefits (the patient) is injured by a third party, receives treatment by a health care provider (the provider) under the Medi-Cal program, and thereafter sues the third party for damages, Welfare and Institutions Code section 14124.791[1] permits the provider to impose a lien on the patient's recovery from the third party to recoup the actual value of its services. Defendants ScrippsHealth and Medical Liability Recoveries, Inc. (together respondents) invoked the section 14124.791 procedure and placed a lien on plaintiff Cimmaron Olszewski's claim against a third party tortfeasor who had contributed to the injuries suffered by Olszewski and treated by ScrippsHealth; respondents sought to recover the actual value of the services provided by ScrippsHealth. Olszewski responded by filing the present action contending that section 14124.791 was invalid and that by filing the lien respondents were liable for unfair competition, fraud, negligent misrepresentation and trespass to chattels. The trial court concluded section 14124.791 was valid and that respondents' conduct was privileged; it therefore sustained respondents' demurrer to the complaint without leave to amend.
This case presents two distinct questions. First, is section 14124.791 invalid because preempted by federal law? The federal law governing the Medi-Cal program requires that every provider that accepts Medi Cal payments for the patient must agree not to seek further payment from the patient; the provider instead must content itself with the amounts paid by Medi-Cal. Whether section 14124.791, which allows a provider to seek more than the amounts paid by Medi-Cal, is preempted by federal law is the broad question posed by this case.
Second, if section 14124.791 is invalid under the preemption doctrine, did the trial court correctly determine that Olszewski's complaint did not state causes of action under the unfair competition statute or in tort? This question requires us to evaluate whether a person who pursues rights under a facially valid statute may be liable under the unfair competition laws or in tort if a court decides the statute is invalid.

I

FACTS[2]
In August 1998 Olszewski was injured in a car accident and received medical *192 treatment from ScrippsHealth. Because Olszewski was eligible for Medi-Cal benefits, ScrippsHealth billed and received payment from Medi-Cal. However, ScrippsHealth claimed the amount it received from Medi-Cal was less than the reasonable value of the services provided to Olszewski.
Olszewski pursued a claim against a third party, seeking damages arising out of the accident. In October 1998 respondents filed a provider lien pursuant to section 14124.791 against any damages Olszewski might recover from the third party; respondents' lien alleged the reasonable value of the services provided to Olszewski by ScrippsHealth was $200,880.22.
Olszewski objected to the lien and filed this class action and private attorney general lawsuit alleging respondents engaged in unlawful, unfair and fraudulent business practices by accepting Medi-Cal payments for services to Medi-Cal patients and thereafter pursuing lien claims under section 14124.791. Olszewski's complaint contended section 14124.791 is invalid because it is preempted by the federal Medicaid rules, and pleaded a cause of action under the unfair competition law[3] (Bus. & Prof. Code, § 17200 et. seq.) as well as causes of action for fraud, negligent misrepresentation and trespass to chattels.
Respondents demurred to the complaint, arguing section 14124.791 was not preempted by federal Medicaid rules and that their conduct was privileged. The trial court agreed with respondents' contentions and sustained the demurrer without leave to amend.[4] Olszewski appeals from the subsequent judgment dismissing her complaint.

II

STATUTORY FRAMEWORK

A. The Federal Ban on Balance Billing.

California's Medi-Cal program receives federal Medicaid funds to help finance California's Medi-Cal program. As a condition of receipt of Medicaid funds, the Medi-Cal program must comply with federal laws and regulations. (Mission Community Hospital v. Kizer (1993) 13 Cal.App.4th 1683, 1689, 17 Cal.Rptr.2d 303.) The preemptive federal rule alleged in this case is the rule prohibiting what has been called balance billing. Balance billing refers to the practice of billing patients for the balance remaining on a medical bill after deducting the amount paid by Medi-Cal.[5] *193 (See Palumbo v. Myers (1983) 149 Cal.App.3d 1020, 1025, 197 Cal.Rptr. 214.)
Under the federal Medicaid law, a "[s]tate plan for medical assistance must [provide] [¶] ... [¶] that in case of an individual who is entitled to medical assistance under the State plan with respect to a service for which a third party is liable for payment, the person furnishing the service may not seek to collect from the individual (or any financially responsible relative or representative of that individual) payment of an amount for that service...." (42 U.S.C. § 1396a, subd. (a)(25)(C).)[6] Medi-Cal, as the state agency distributing the federal funds, "must limit participation in the Medicaid program to providers who accept, as payment in full, the amounts paid by the agency. . . ." (42 C.F.R. § 447.15.) Therefore, under federal law, ScrippsHealth was eligible for Medi-Cal money only if it agreed to accept the Medi Cal money as payment in full. Because the complaint alleges Scripps-Health made such an agreement, Scripps-Health is barred from billing the patient for any balance above the amounts paid by Medi-Cal. (Palumbo v. Myers, supra, 149 Cal.App.3d 1020, 197 Cal.Rptr. 214; Serafini v. Blake (1985) 213 Cal.Rptr. 207, 167 Cal.App.3d Supp. 11, 17; cf. Rybicki v. Hartley, supra, 792 F.2d at pp. 261-262 [Medicare].)

B. The 1985 Effort to Avoid the Balance Billing Ban.

In 1985 the California Legislature attempted to avoid in part the federal ban on balance billing by enacting provisions contained in Chapter 776 of the Statutes of 1985. This Chapter tentatively amended section 14124.791 to allow providers to file a lien for the balance not paid by Medi-Cal against sums recovered by the patient from third parties responsible for the patient's injuries. It also tentatively amended section 14124.74 to provide that if a Medi-Cal patient received an award in a lawsuit arising out of the patient's injury, the courtafter first ensuring payment of litigation expenses and reimbursement to Medi-Calwas to impose a lien against the patient's recovery in favor of the provider in the amount of any unpaid charges.
The Legislature apparently recognized that these provisions were in conflict with the federal ban on balance billing, and specified that these provisions were not to become effective until "appropriate federal waivers" were obtained. (Stats.1985, ch. 776, § 6, p. 2515.) The federal government denied the waiver requests in 1986, and these provisions never became effective. (Historical and Statutory Notes, 74A West's Ann. Welf. & Inst.Code (1991 ed.) § 14019.3, p. 77.)

*194 C. The 1992 Effort to Avoid the Balance Billing Ban.

In 1992 the Legislature again sought to avoid in part the federal ban on balance billing by enacting the current version of section 14124.791. Subdivision (a) of section 14124.791 contains two relevant provisions. The first provision permits the provider to file a lien for services provided to a patient in connection with an injury caused by a third party, even if the provider has received payment from Medi-Cal, "for all fees for services provided to the [patient] against any judgment, award, or settlement obtained by the [patient] against that third party." The second provision permits the provider to "recover upon the lien [only] if the provider has made a full reimbursement of any fees" paid to the provider by Medi-Cal.[7] The 1992 version of section 14124.791 provides for creation of a lien against a personal injury recovery from a third person for the full amount of the provider's bill and for recovery of this full amount by the provider if the provider makes a full reimbursement to Medi-Cal of the monies it had previously been paid.
In 1997 Ms. Moore, acting director of the federal Medicaid Bureau, issued a letter "clarifying our policies" regarding provider reimbursement rights when the patient has a tort claim against third parties. The letter, synopsizing the clarification, stated federal rules would be broadened to:
"allow States to permit providers to pursue payment in excess of Medicaid's reimbursement in tort situations as long as certain conditions are met. Specifically, States must assure that Medicaid is made whole before providers can keep any monies. Second, the State must assure protection to its Medicaid beneficiaries by prohibiting providers from receiving money that has been designated to go to the beneficiary."
In the detailed analysis accompanying this policy clarification, the HCFA letter recognized that in tort situations the judgment or settlement will often contain elements compensating the patient for items other than the costs incurred for medical services, including compensation for pain and suffering and loss of consortium; that existing federal rules permit a state to impose a lien on the entire judgment or settlement up to the amount paid by Medicaid; and that under the federal rules Medicaid payments are reimbursed first, with any remaining balance distributed to the patient. Against that background, the analysis stated:
"[I]n a tort situation, if the provider were to reimburse the Medicaid program, and then seek reimbursement for *195 the full amount of its charges which includes the amount Medicaid has paid the provider, this could have the effect of taking monies from the [patient]. [¶] As long as States assure preservation of certain principles, Federal law would not preclude the practice of providers pursuing payment in tort situations in excess of Medicaid's reimbursement.... Specifically, the State must assure that Medicaid is made whole before providers can keep any monies. The State must also prohibit providers from pursuing money that has been awarded to the [patient]. In other words, the provider lien must be against the tortfeasor and not the general assets of the [patient], e.g., the provider would be entitled to reimbursement from a tort judgment or settlement when the settlement specifically designates a set amount of money for medical expenses and then only if this amount is above the amount owed to Medicaid. The provider could be reimbursed only if the money has not been allotted to the beneficiary in a court judgment or settlement. This would mean that if the lien were not perfected, the tortfeasor would stand to retain the money."

III

THE PREEMPTION ISSUE
Olszewski contends that section 14124.791 is invalid because it is preempted by the federal ban on balance billing; that the HCFA letter purporting to approve statutes like section 14124.791 is contrary to the federal statutes and regulations and is entitled to no weight in construing the federal scheme; and, even if the HCFA letter properly construes the federal scheme, section 14124.791 does not comply with the conditions described in the HCFA letter. Respondents counter that section 14124.791 is valid because it is not an improper balance billing statute, and instead is a form of substitute billing that is consistent with the goals of the Medicaid law and with the regulatory interpretation of the federal rules contained in the HCFA letter.

A. Standards for Evaluating a Claim of Preemption.

When a state law is contrary to a valid federal law, the federal law controls. (U.S. Const., art. VI, cl.2.) The courts have developed three alternative tests for determining whether state law is contrary to and therefore preempted by federal law. Under the test denominated as express preemption, the issue is whether Congress has explicitly declared an intent that its enactments will preempt state law. Under the second test, denominated as field preemption, the issue is whether Congress intended federal law to occupy the field and thereby impliedly intended to preempt state regulation in that arena. Under the third test, denominated as conflict preemption, the issue is whether the state law actually conflicts with federal law either because compliance with both federal and state laws is impossible or because state law is an obstacle to the accomplishment of the purposes and objectives of Congress. (English v. General Electric Co. (1990) 496 U.S. 72, 78-79, 110 S.Ct. 2270, 110 L.Ed.2d 65.) These categories are not rigidly distinct, and they often overlap. (Crosby v. National Foreign Trade Council (2000) 530 U.S. 363, 372, fn. 6, 120 S.Ct. 2288, 147 L.Ed.2d 352.) We use these categories as analytic tools to evaluate the ultimate issue: whether the purpose and intent of Congress in enacting a particular federal statute require that state laws affecting the area be preempted. (Cipollone v. Liggett Group, Inc. (1992) 505 U.S. 504, 516, 112 S.Ct. 2608,120 L.Ed.2d 407.)

*196 B. Section 14124.791 is Preempted by Federal Law.

Olszewski contends section 14124.791 is preempted because it is inconsistent with, and frustrates the achievement of, the payment in full language of 42 C.F.R. § 447.15 and the ban on balance billing contained in 42 U.S.C. § 1396a, subd. (a)(25), both of which embody a core policy of Medicaid law: a provider who is properly paid under the Medicaid program may not collect any additional amounts by levying on the patient's other assets.[8] Olszewski argues section 14124.791 conflicts with these laws and policies because permitting a provider to levy on a patient's recovery from a third party tortfeasor, whether in the form of a judgment or settlement, improperly authorizes a provider to seize an asset belonging to the patient to satisfy the balance owed to a provider. Respondents contend there is a distinction between the federally-prohibited balance billing, which bars a provider from seeking from the patient amounts beyond those paid by Medicaid, and substitute billing, in which the provider substitutes payment from a third party source for the payment receivable from Medicaid. Respondents argue substitute billing does not conflict with federal law, but instead furthers the policy that Medicaid be used as a payer of last resort, and assert section 14124.791 is a valid substitute billing statute because it allows the provider to collect only from third party sources.
Whether section 14124.791 is a balance billing statute preempted by federal law, or is instead a substitute billing statute that does not offend the federal ban on balance billing,[9] is principally a matter of statutory construction. When construing a statute, we examine the language used, and when the plain meaning of the language is unambiguous that meaning is controlling. (Diamond Multimedia Systems, Inc. v. Superior Court (1999) 19 Cal.4th 1036, 1046-1047, 80 Cal.Rptr.2d 828, 968 P.2d 539.) The question presented here is whether a state statute is preempted, and *197 this issue "turns on the actual content of [the state statute] and its real effect on federal rights." (Livadas v. Bradshaw (1994) 512 U.S. 107, 119, 114 S.Ct. 2068, 129 L.Ed.2d 93.)
The plain meaning of section 14124.791 does not support respondents' claim that it operates to allow the provider to collect from the third party tortfeasor rather than from the patient. Section 14124.791 does not create any direct right of action against the tortfeasor in favor of the provider. Instead, it permits the provider to assert a lien against, and to collect from, "any judgment, award, or settlement obtained by the [patient]" against the third party tortfeasor. Although section 14124.791 limits the type of asset owned by the patient that is subject to the provider's lien (e.g. the funds collected from the judgment or settlement), it nevertheless permits a provider to levy on property owned by the patient to satisfy the patient's full medical bill. Thus, the "actual content of [section 14124.791] and its real effect on federal rights" (Livadas v. Bradshaw, supra, 512 U.S. at p. 119, 114 S.Ct. 2068) is to permit a provider to collect from the patient's assets for the full amount of the provider's bill in violation of the ban on balance billing.
Although there are no California cases evaluating statutes similar to section 14124.791, courts in other jurisdictions that have considered analogous situations have concluded the federal ban on balance billing prohibits a provider from levying on a judgment obtained by the patient against the third party tortfeasor. For example, in Evanston Hosp. v. Hauck (7th Cir.1993) 1 F.3d 540 (Evanston Hospital), the hospital had provided medical care to a patient badly injured in an electrical accident, and had amassed a large bill. The patient could not pay the bill, and the hospital eventually accepted a lesser amount from the state Medicaid agency. The patient later recovered a multi-million dollar judgment against a third party. The hospital then filed an action against the patient and the state Medicaid agency, seeking a declaration that the hospital could refund the Medicaid payments and thereafter sue the patient for the full amount of the billings. The Seventh Circuit, relying upon federal statutes and corresponding state law, ruled that a provider that had accepted Medicaid funds could not simply repay those funds and then seek to obtain additional funds from the patient.
The only distinction between Evanston Hospital and the instant case is that in Evanston Hospital there was no state statute specifically authorizing repayment of Medicaid funds followed by a collection action against the patient and his assets; here respondents proceeded under a state statute authorizing that procedure. This distinction, however, is immaterial because the decision in Evanston Hospital did not depend upon the absence of a state-enabling statute, and the presence of a state statute does not change the decision here. The Evanston Hospital decision rested primarily on the ban on balance billing, and noted there was no suggestion in the federal law that providers could avoid the payment-in-full mandate merely because a patient later became wealthier.[10] Moreover, *198 the Evanston Hospital court noted the adverse financial effects on the Medicaid system that could flow from a rule allowing a hospital to recover Medicaid funds in all cases, then later decide to repay in selected cases in order to collect from patients who later became solvent. If the hospital had that option, "hospitals would have every incentive to capture as much government money as they could without regard for the probabilities of collecting reimbursement from the private party" (id. at p. 544) and could "turn Medicaid upside down by converting the system into an insurance program for hospitals rather than for indigent patients." (Ibid.) For these reasons, Evanston Hospital rejected the proposition that the hospital could repay the Medicaid funds and then sue the patient; this proposition conflicted with federal law.
In Public Health Trust v. Dade Cty. School (Fla.App.1996) 693 So.2d 562, the court considered a Florida administrative regulation that parallels section 14124.791. That regulation allowed a provider that had accepted Medicaid payment to pursue liable third parties and, after repaying the state for Medicaid payments, "any excess third-party benefits collected by a provider are permitted to be applied to provider charges that exceed Medicaid payment." (Id. at p. 566.) The Public Health Trust court concluded this regulation was in direct conflict with the federal "payment in full" requirement, and was therefore invalid under the Supremacy Clause. (Ibid.) The Public Health Trust court, citing Evanston Hospital, recognized that its holding created the possibility of a "windfall" insofar as the patient received medical care for which he did not pay, but "`someone was bound to receive a windfall in these circumstances, and Congress decided it should be the recipient of medical care, not the hospital.'" (Public Health Trust, supra, at p. 567, quoting Evanston Hospital; accord, see Mallo v. Public Health Trust of Dade County, Florida (S.D.Fla. 2000) 88 F.Supp.2d 1376, 1385-1387.)
The only California case to evaluate an analogous effort by a provider concluded a provider may not repay Medicaid and thereafter collect from the patient's recovery from a tortfeasor. In Palumbo v. Myers, supra, 149 Cal.App.3d 1020, 197 Cal.Rptr. 214, the court evaluated whether section 14019.4, which excepted from the ban on balance billing the right to bill a "third party payer who provides a contractual or legal entitlement" to the costs of the health care, permitted the provider to seek recovery of the balance from a third party tortfeasor. Although Palumbo decided the provider could not collect from the tortfeasor based on its interpretation of statutory language, deciding that the statutory "third party payer" language did not encompass a third party tortfeasor, it recognized that a "lurking preemption question" would arise if the federal payment-in-full provisions conflicted with a California statute purporting to expand the rights of a provider to collect beyond the amount paid by Medicaid. (Id. at pp. 1030-1034, fn. 10, 197 Cal.Rptr. 214.)
Respondents correctly note that, with the exception of Public Health Trust v. Dade Cty. School, supra, 693 So.2d 562, none of the foregoing decisions directly decided that a state statute similar to section 14124.791 conflicted with federal law. Respondents argue we should give substantial deference to the 1997 HCFA letter opining that federal law does not prevent a state from enacting a statute allowing providers to collect the actual value of their services from third party tortfeasors (see, generally, Thomas Jefferson University v. Shalala (1994) 512 U.S. 504, 512, 114 S.Ct. *199 2381, 129 L.Ed.2d 405 [administrative agency interpretation of own regulations entitled to substantial deference unless inconsistent with regulation]; Lyng v. Payne (1986) 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921), and that section 14124.791 is therefore valid. However, even were the HCFA's policy clarification entitled to deference,[11] we conclude section 14124.791 is not the type of statute that qualifies under the terms of the HCFA letter.
The HCFA letter placed two specific limitations on permissible state statutes. First, the hypothetical statute must assure Medicaid is made whole before providers can obtain any monies. Second, the hypothetical statute must assure Medicaid beneficiaries are protected by prohibiting providers from seizing money awarded to the beneficiary apart from the portion of the award representing medical expenses.[12] We interpret this latter limitation, which preserves the patient's right to retain all amounts awarded either as general damages or as special damages apart from medical expenses, to be consistent with the core policy underlying the ban on balance billing: the provider may not collect from a patient's assets for balances owed above the amounts paid by Medicaid.
Although section 14124.791 meets the reimburse Medicaid condition, it does not *200 satisfy the second condition. First, section 14124.791's lien attaches to the entire award recovered by the patient; the lien is not limited to those cases where the recovery "specifically designates a set amount of money for medical expenses...." Second, in California, the special damages for medical care recoverable by a Medicaid beneficiary against a third party tortfeasor is limited to the amounts paid by Medi-Cal. (Hanif v. Housing Authority (1988) 200 Cal.App.3d 635, 639-644, 246 Cal.Rptr. 192.) Because of this substantive limitation on recoverable damages, a section 14124.791 lien cannot comply with HCFA's mandate permitting liens only where the award includes a medical expense component "above the amount owed to Medicaid." Finally, we cannot overlook that, as a practical matter, settlements or judgments ordinarily are for a lump sum amount and are rarely compartmentalized in a manner that would allow the medical expense component, the only component lienable under the HCFA letter, to be identified and distinguished from other non-lienable components of the award. Section 14124.791 does not require compartmentalization, and does not limit its lien to the lienable component; it instead authorizes the lien to attach to the entire award, including those portions awarded to the patient for damages unrelated to medical expenses.
Even if the HCFA correctly opined a provider lien statute could be designed that would be consistent with Medicaid's ban on balance billing, section 14124.791 on its face does not limit, and could not be construed (absent a change in the rule of law described in Hanif v. Housing Authority) as limiting, the provider to collecting only that portion of the judgment or settlement representing special damages for medical expenses in excess of the amount paid by Medi-Cal. Because its "actual content ... and its real effect on federal rights" (Livadas v. Bradshaw, supra, 512 U.S. at p. 119, 114 S.Ct. 2068) is to permit a provider to collect from the patient's assets for the full amount of the provider's bill, in violation of the ban on balance billing, section 14124.791 conflicts with and is preempted by federal law.[13]

IV

THE PLEADING ISSUES
Olszewski argues the trial court erroneously sustained respondents' demurrer to her cause of action under the UCL and her tort claims because respondents' actions were not protected by the litigation privilege (Civ.Code, § 47, subd. (b)(2)), and her complaint otherwise sufficiently pleaded claims for relief under each of those theories. Respondents counter that they were entitled to rely on, and did nothing more than pursue the rights conferred by, the provisions of section 14124.791; accordingly, Olszewski did not and could not plead facts sufficient to *201 constitute claims in either tort or under the UCL and their actions were absolutely privileged. We conclude that, under Cel-Tech, supra, 20 Cal.4th 163, 83 Cal. Rptr.2d 548, 973 P.2d 527, a private party statutorily authorized to engage in specified conduct does not incur liability under the UCL for pursuing in good faith the conduct authorized by that legislative enactment, even though a court later determines the statute suffers from some infirmity. We also conclude that a private party statutorily authorized to assert a lien claim in existing or nascent litigation is shielded by the absolute privilege against all tort claims (other than for malicious prosecution or abuse of process) for alleged injuries arising out of that conduct.

A. General Principles.

The standards governing Olszewski's cause of action under the UCL are well established. The UCL does not proscribe specific practices, but instead defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice." (Bus. & Prof.Code, § 17200.) Its coverage is sweeping and embraces "`"anything that can properly be called a business practice and that at the same time is forbidden by law."'" (Rubin v. Green (1993) 4 Cal.4th 1187, 1200, 17 Cal. Rptr.2d 828, 847 P.2d 1044, quoting Barquis v. Merchants Collection Assn. (1972) 7 Cal.3d 94, 113, 101 Cal.Rptr. 745, 496 P.2d 817.) By proscribing any unlawful business practice, Business and Professions Code section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable, and "[virtually any lawfederal, state or localcan serve as a predicate for a [Business and Professions Code] section 17200 action." (State Farm Fire & Casualty Co. v. Superior Court (1996) 45 Cal.App.4th 1093, 1102-1103, 53 Cal.Rptr.2d 229, disapproved on other grounds in Cel-Tech, supra, 20 Cal.4th at pp. 184-187, fn. 12, 83 Cal.Rptr.2d 548, 973 P.2d 527.) Moreover, the disjunctive language means that a practice that is unfair, fraudulent or unlawful is actionable under the UCL. (Ibid.) A practice is unfair if it "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." (People v. Casa Blanca Convalescent Homes, Inc. (1984) 159 Cal.App.3d 509, 530, 206 Cal.Rptr. 164, disapproved on other grounds in Cel-Tech, supra, 20 Cal.4th at pp. 184-187, fn. 12, 83 Cal. Rptr.2d 548, 973 P.2d 527.) A practice is fraudulent if it is one in which "`the public is likely to be deceived.'" (Bank of the West v. Superior Court (1992) 2 Cal.4th 1254, 1267, 10 Cal.Rptr.2d 538, 833 P.2d 545.)
Olszewski's fraud cause of action requires (1) a misrepresentation of a past or existing material fact knowing it to be untrue, (2) with intent to induce another's reliance on the fact misrepresented, (3) ignorance of the truth and justifiable reliance thereon by the party to whom the misrepresentation was directed, and (4) damages. (Wilkins v. National Broadcasting Co. (1999) 71 Cal.App.4th 1066, 1081, 84 Cal.Rptr.2d 329.) The principal difference between Olszewski's fraud claim and her negligent misrepresentation claim is that, for negligent misrepresentation, the party making the misrepresentation need not know of its falsity but instead must make the representation without reasonable grounds for believing it to be true. (B.L.M. v. Sabo & Deitsch (1997) 55 Cal. App.4th 823, 832-833, 64 Cal.Rptr.2d 335.)
Olszewski's final tort claim, denominated as "trespass to chattel," is a "seldom employed [ ] tort theory in California" (Thrifty-Tel, Inc. v. Bezenek (1996) *202 46 Cal.App.4th 1559, 1566, 54 Cal.Rptr.2d 468) and has been described as the "little brother of conversion." (Prosser & Keeton, Torts (5th ed.1984) § 14, pp. 85-86, fn. omitted.) The tort of trespass to chattel requires an intentional interference with the possession of personal property that has proximately caused injury, albeit an interference not sufficiently important to be deemed a conversion that would require the defendant to pay the full value of the property with which he has interfered. (Zaslow v. Kroenert (1946) 29 Cal.2d 541, 551, 176 P.2d 1 ["Where the conduct complained of does not amount to a substantial interference with possession or the right thereto, but consists of intermeddling with or use of ... the personal property, the owner has a cause of action for trespass" to chattel, but not for conversion].)
However, conduct that is otherwise tortious is not actionable if it is privileged. (5 Witkin, Summary of Cat. Law (9th ed. 1988) Torts, § 278, p. 360.) If the conduct that causes the injury is protected by the absolute privilege conferred by Civil Code section 47, subdivision (b)(2), all tort causes of action (other than malicious prosecution or abuse of process) are barred (Ribas v. Clark (1985) 38 Cal.3d 355, 365, 212 Cal.Rptr. 143, 696 P.2d 637; Knoell v. Petrovich (1999) 76 Cal.App.4th 164, 170, 90 Cal.Rptr.2d 162), and if the pleading discloses that the tort claims are premised on conduct that is absolutely privileged it is proper to sustain a general demurrer to those claims. (Whelan v. Wolford (1958) 164 Cal.App.2d 689, 693, 331 P.2d 86.)

B. Analysis of UCL Claim.

Although the language of the UCL is broad, it does not confer unlimited powers on a court to declare what conduct is actionable. As the court explained in Cel-Tech:
"Courts may not simply impose thenown notions of the day as to what is fair or unfair. Specific legislation may limit the judiciary's power to declare conduct unfair. If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a `safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." ((Cel-Tech, supra, 20 Cal.4th at p. 182, 83 Cal.Rptr.2d 548, 973 P.2d 527.)
The Cel-Tech court cautioned that, in order to invoke this safe harbor, another provision of law must actually bar the action or clearly permit the conduct; it is not enough that the statute does not itself provide a cause of action or prohibit the challenged conduct, because there is a difference between not making an activity unlawful, and making that activity lawful. The court reasoned that an act the Legislature has determined to be lawful may not form the basis for an action under the UCL, but an act may (if otherwise unfair) be challenged under the UCL even if the Legislature did not specifically proscribe it in some other provision; the Legislature cannot anticipate all possible forms in which unfairness might occur. (Id. at 182-183, 83 Cal.Rptr.2d 548, 973 P.2d 527.) The appropriate test, declared Cel-Tech, is:
"If, in the Unfair Practices Act (or some other provision), the Legislature considered certain activity in certain circumstances and determined it to be lawful, courts may not override that determination under the guise of the unfair competition law. However, if the Legislature did not consider that activity in those circumstances, the failure to proscribe it in a specific provision does not prevent a judicial determination that it is unfair *203 under the unfair competition law." (20 Cal.4th at p. 183, 83 Cal.Rptr.2d 548, 973 P.2d 527.)
Cel-Tech applied its test utilizing a "a two-step process. First, we must determine whether the Legislature has provided a safe harbor for [defendant's] conduct. Second, if it has not, we must determine whether that conduct is unfair as we have just defined it." (Cel-Tech, supra, 20 Cal.4th at p. 187, 83 Cal.Rptr.2d 548, 973 P.2d 527.) The Cel-Tech court concluded that, on the facts presented in the case before it, some of the conduct was potentially actionable under the UCL but other statutorily authorized conduct could not form the basis for a UCL claim.[14] (Id. at pp. 187-189, 83 Cal.Rptr.2d 548, 973 P.2d 527; accord, Schnall v. Hertz Corp. (2000) 78 Cal.App.4th 1144, 1160-1163, 93 Cal. Rptr.2d 439 [statute authorizing rental car company to impose "avoidable fuel service charge" bars UCL claim alleging amount of charges was unfair business practice].)
The conduct alleged by Olszewski as the unlawful, unfair or fraudulent business act or practice is precisely the conduct authorized by section 14124.791. Because the Legislature considered that activity and determined it to be lawful, we may not override that determination by permitting a UCL claim against a private party and deprive that private party of the safe harbor constructed by the Legislature. Olszewski argues the safe harbor cannot protect respondents from her UCL claim because section 14124.791 is invalid. We acknowledge Cel-Tech's safe harbor doctrine has not yet been applied to a statute operative at the time the private party relied on the statute and engaged in the permitted conduct and the statute was later declared invalid. We conclude, however, that Cel-Tech's safe harbor doctrine should be applied in this context. When the Legislature enacts a facially valid state law that specifically grants a right or remedy to private parties, we believe the parties should be entitled to rely on that law to conduct their affairs and not be required to second guess the legislative enactment, or to prognosticate whether the statute will survive myriad subsequent legal challenges, and be subjected to liability under the UCL should their crystal ball fail them. Accordingly, when a private party engages in conduct that, at the time he or she acts, qualifies for Cel-Tech's safe harbor protection, conduct lawful when the party acted is not made unlawful (at least for purposes of liability under the UCL) by a later judicial determination that closes the safe harbor created by the Legislature.[15] Olszewski's UCL claim is therefore *204 barred by Cel-Tech's safe harbor protection.

C. The Tort Claims.

Respondents contend that, because the conduct allegedly causing Olszewski's injury was shielded by the absolute privilege under Civil Code section 47, subdivision (b)(2), her tort causes of action are barred. Olszewski argues the privilege does not apply.
The principal purpose of Civil Code section 47, subdivision (b)(2) is to afford litigants and witnesses freedom of access to the courts without fear of being subsequently harassed by derivative tort actions. "[T]he privilege applies to any communication (1) made in judicial or quasijudicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that has some connection or logical relation to the action." (Silberg v. Anderson (1990) 50 Cal.3d 205, 212-213, 266 Cal.Rptr. 638, 786 P.2d 365.) "Further, it applies to any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved." (Ibid.)
The courts, applying these general principles, have concluded that lien notices required or permitted by law are protected by the privilege as communications in judicial proceedings made to achieve the objects of the litigation. (See, e.g., Frank Pisano & Associates v. Taggart (1972) 29 Cal.App.3d 1, 25, 105 Cal.Rptr. 414 [mechanics' lien notice].) In Wilton v. Mountain Wood Homeowners Assn. (1993) 18 Cal.App.4th 565, 22 Cal.Rptr.2d 471, the issue was whether a homeowners association assessment lien was protected by the privilege even though it was not a part of existing litigation and would not necessarily be foreclosed or enforced by litigation. The Wilton court concluded the privilege applied because a publication in the course of a judicial proceeding can include prelitigation demand letters, and stated:
"Like mechanics' liens, homeowners' assessment liens are permitted by law to achieve the object of litigation. Both types of liens must be filed as a first step in foreclosure actions to remedy defaults, and are thus closely related to judicial proceedings. We therefore conclude that the publication of homeowners' assessment liens is absolutely privileged under Civil Code section 47, subdivision (b)." (Wilton, supra, 18 Cal. App.4th at p. 569, 22 Cal.Rptr.2d 471.)
The remedy provided by section 14124.791 is analogous to the lien rights *205 considered by Pisano and Wilton. In each case, the legislative scheme confers on private parties the right to pursue certain remedies but requires that the claimant/prospective litigant give notice of a lien to the affected parties to pursue those remedies. Accordingly, the absolute privilege protects respondents from derivative tort lawsuits seeking to recover for injuries caused by respondent's assertion of its lien claim.
Olszewski argues the absolute privilege is inapplicable here. First, she argues the privilege applies only to communications made "in a judicial proceeding" (LiMandri v. Judkins (1997) 52 Cal. App.4th 326, 345, 60 Cal.Rptr.2d 539), and the complaint does not reveal on its face that Olszewski's claim was ever in litigation.[16] However, the privilege extends to prelitigation communications asserting a party's claim and seeking to settle that claim without litigation (Lerette v. Dean Witter Organization, Inc. (1976) 60 Cal. App.3d 573, 577-578, 131 Cal.Rptr. 592), and a lien claim filed before litigation commences remains privileged even if the claimant ultimately elects to enforce his rights outside the litigation process. (Wilton v. Mountain Wood Homeowners Association, supra, 18 Cal.App.4th at 569-570, 22 Cal.Rptr.2d 471 [privilege applies even though lien claimant has option of pursuing nonjudicial enforcement of lien rights].)
Olszewski also asserts the privilege does not bar her tort claims based on the analysis employed by this court in LiMandri v. Judkins, supra, 52 Cal.App.4th 326, 60 Cal.Rptr.2d 539. In LiMandri, an attorney representing clients in a lawsuit had a fee agreement granting the attorney a portion of the recovery. The defendant allegedly intentionally interfered with that contractual relationship by arranging a loan to the clients secured by the recovery and filed a notice of lien in the lawsuit asserting the lender's security interest in the recovery. The LiMandri court rejected the defendant's argument that the absolute privilege barred the attorney's claim for intentional interference with an existing contractual relationship. First, reasoned LiMandri, the privilege protects communicative acts rather than noncommunicative conduct, and therefore when a defendant engages in a course of conduct that is tortious, the fact that the conduct incidentally included a privileged communication does not permit the defendant to interpose the privilege to shield him from liability arising out of the course of conduct. (Id. at p. 345, 60 Cal.Rptr.2d 539.) Second, noted LiMandri, the conduct that produced the injury was creation of the competing lien, not the assertedly privileged act of giving notice of the lien. (Ibid.) Third, LiMandri reasoned that even if the communicative conduct was the cause of the injury, the party giving notice of the lien was not a litigant or other participant authorized by law to intervene in the underlying lawsuit. Finally, even if the defendant could be deemed an authorized participant, to be privileged a communication must be connected or logically related to the litigation or engaged in for the purpose of achieving the objects of the litigation, and the notice of lien was to enforce a debt *206 wholly unrelated to the underlying lawsuit. (Id. at pp. 345-346, 60 Cal.Rptr.2d 539.) For all of these reasons, LiMandri concluded the privilege did not bar the plaintiffs action.
Olszewski seeks to bring herself within LiMandri by arguing her complaint does not seek to recover for injuries caused by the filing of the lien, but instead seeks to recover for the injury caused by respondents' improper collection practice of attempting to collect money in violation of the federal ban on balance billing. However, unlike LiMandri Olszewski's complaint does not identify any wrongful conduct by respondents apart from pursuing collection by asserting the lien authorized by section 14124.791.[17] Thus, Olszewski does not assert any injury-producing conduct that is divorced from the privileged communication (Ribas v. Clark, supra, 38 Cal.3d at p. 365, 212 Cal.Rptr. 143, 696 P.2d 637 [privilege bars recovery where injury results exclusively from privileged communication]) and may not avoid the privileged nature of respondents' act merely be relabeling the assertion of a statutory lien right as a wrongful collection practice.

V

THE AMENDMENT ISSUE
Olszewski next argues the court abused its discretion by denying her request, made orally at the hearing on the demurrer, for leave to amend her complaint to assert two new theories of liability under the UCL. Her first proposed theory was that respondents' practices violated the contract obligations they owed to the California Department of Health Services. In her second theory, she argued that even if the HCFA letter correctly concluded statutes like section 14124.791 could be consistent with federal Medicaid rules, the HCFA letter specified that certain conditions must be satisfied and respondents' practices violated those conditions.
It is an abuse of discretion to deny a plaintiff leave to amend a complaint if there is a reasonable possibility that the pleading can be cured by amendment. (Hendy v. Losse (1991) 54 Cal.3d 723, 742, 1 Cal.Rptr.2d 543, 819 P.2d 1.) However, to demonstrate an abuse of discretion, the burden is on the plaintiff to show there is a reasonable possibility that the proposed amendment will cure the defect (Blank v. Kinvan, supra, 39 Cal.3d at p. 318, 216 Cal.Rptr. 718, 703 P.2d 58) by showing how the amendment will change the legal effect of the complaint. (Goodman v. Kennedy (1976) 18 Cal.3d 335, 349, 134 Cal. Rptr. 375, 556 P.2d 737.) The plaintiff may make this showing at the hearing on the original demurrer, or by submitting a *207 proposed amended pleading as part of a motion for reconsideration of the order sustaining the demurrer, or by making the necessary showing on appeal. (Careau & Co. v. Security Pacific Business Credit, Inc. (1990) 222 Cal.App.3d 1371, 1386-1388, 272 Cal.Rptr. 387.)
At trial, Olszewski did not submit a proposed pleading containing the new allegations, either in opposition to the demurrer or by a motion for reconsideration, and she has not on appeal lodged a proposed pleading articulating how her new allegations would change the legal effect of her complaint in a manner that would state a claim under the UCL. Because there exists no proposed pleading showing a reasonable possibility that an amended complaint will cure the defect (Baum v. Duckor, Spradling & Metzger (1999) 72 Cal.App.4th 54, 73, 84 Cal.Rptr.2d 703), she has not carried the burden of showing that sustaining the demurrer without leave to amend was an abuse of discretion.
Even disregarding the absence of a proposed pleading, the fundamental impediments to Olszewski's ability to state a UCL claim that we have identified are not obviated by the theories she has articulated. Olszewski's first theory rests on the contract between ScrippsHealth and the State of California governing services to Medi-Cal beneficiaries. Under the contract,[18] ScrippsHealth is obligated to accept Medi-Cal payments as payment for services provided to Medi-Cal beneficiaries; Olszewski argues she should be given leave to amend her complaint to allege that respondents' practice of seeking additional compensation was a breach of contract constituting an unlawful, unfair or fraudulent business practice. However, the contract provides it is governed by Part 3, Division 9 of the Welfare and Institutions Code, which includes section 14124.791, and explicitly states that "[a]ny provision of this Contract in conflict with [those laws] is hereby amended to conform to the provisions of those laws and regulations [and] [s]uch amendment of the Contract shall be effective on the effective date of the statute or regulation necessitating it, and shall be binding on the parties even though such amendment may not have been reduced to writing and formally agreed upon and executed by the parties ..." Olszewski does not explain how respondents, as parties to a contract automatically amended to adopt the provisions of section 14124.791, could be found to have violated that contract by pursuing the rights conferred by section 14124.791. Thus, the same impediment to Olszewski's UCL claim remains extant under her breach of contract theory: respondents' pursuit of rights statutorily and contractually conferred on them entitle respondents to Cel-Tech's safe harbor and precludes Olszewski from stating a viable UCL claim.
Olszewski's noncompliance with HCFA conditions theory faces an analogous defect. Although this theory is somewhat opaque, she appears to argue that because the HCFA permits lien claims only when certain conditions are met and respondents' lien claim did not satisfy those conditions, respondents committed an unlawful, unfair or fraudulent business practice. We agree section 14124.791 does not satisfy the HCFA standards for permissible *208 lien statutes, and that respondents' invocation of section 14124.791 does not create any enforceable lien on Olszewski's recovery. However, this theory alleges nothing more than that respondents invoked the statutory procedure but their lien claim did not satisfy the HCFA standards because section 14124.791 does not conform to those standards. Because this theory is a mere reformulation of Olszewski's claim that respondents are liable under the UCL because they pursued their statutory remedies, we conclude respondents are entitled to the benefits of Cel-Tech's safeharbor and Olszewski cannot negate that protection by recharacterizing respondents' compliance with the statute as a distinct business practice that violates federal law.

VI

THE APPROPRIATE DISPOSITION
Our review of the record below convinces us the trial court correctly perceived that Olszewski's complaint, although nominally asserting only claims under the UCL and in tort, contained an imbedded claim for declaratory relief as to the validity of section 14124.791 and respondents' claim of lien under that section.[19] (Minor v. Municipal Court (1990) 219 Cal.App.3d 1541, 1548, 268 Cal.Rptr. 919 [where complaint contains sufficient facts showing proper subject for declaratory relief, court may disregard label and issue declaratory judgment].) The trial court's judgment contains two distinct aspects: first, it declared section 14124.791 was not preempted by federal law; second, it used the declaratory judgment as a springboard to decide that respondents' demurrers to the UCL and tort claims should be sustained without leave to amend.
We have concluded that the judgment, insofar as it encompasses the declaration that section 14124.791 is valid and not preempted by federal law, was erroneous and to that extent cannot stand. However, we have also concluded that, even though section 14124.791 is invalid and respondents therefore have no enforceable lien claim to the fund received by Olszewski from the third party tortfeasor, the trial court nevertheless correctly sustained respondents' demurrer to Olszewski's UCL and tort claims without leave to amend. (J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co. (1997) 59 Cal.App.4th 6, 15-16, 68 Cal.Rptr.2d 837 [where judgment of dismissal after demurrer was proper, judgment affirmed even though reason articulated by trial court was incorrect].)
We must therefore consider the appropriate disposition of this matter. Where it appears from the record that as a matter of law there is only one proper judgment, an appellate court may reverse and direct that the trial court enter the proper judgment (Conley v. Matthes (1997) 56 Cal.App.4th 1453, 1459, fn. 7, 66 Cal. Rptr.2d 518) or alternatively may modify the judgment and affirm it as so modified (Sagadin v. Ripper (1985) 175 Cal.App.3d 1141, 1170, 221 Cal.Rptr. 675). We conclude the latter approach is appropriate, and therefore order that, as modified in the disposition portion of this opinion, the judgment is affirmed.

DISPOSITION
Section 14124.791 is invalid because it is preempted by federal law. Accordingly, *209 respondents' lien under section 14124.791 is invalid, and all funds collected by Olszewski from the third party tortfeasor, whether by settlement or judgment, are free of any lien claimed by respondents under section 14124.791. In all other respects, the judgment of dismissal is affirmed. The parties shall bear their own costs on appeal.
NARES, Acting P.J., and O'ROURKE, J., concur.
NOTES
[1] All statutory references are to the Welfare and Institutions Code, unless otherwise specified.
[2] Because this appeal is from a judgment of dismissal following the sustaining of a demurrer without leave to amend, we accept as true the facts alleged in the complaint, together with facts that may be implied or inferred from those expressly alleged. (Marshall v. Gibson, Dunn & Crutcher (1995) 37 Cal. App.4th 1397, 1403, 44 Cal.Rptr.2d 339.) We do not, however, accept the truth of contentions or conclusions of fact or law. (Blank v. Kirwan (1985) 39 Cal.3d 311, 318, 216 Cal. Rptr. 718, 703 P.2d 58.)
[3] The Legislature did not give an official name to the provisions of Business and Professions Code section 17200 et seq., but the courts have labeled these provisions the "unfair competition law." (Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. (1999) 20 Cal.4th 163, 169, 83 Cal.Rptr.2d 548, 973 P.2d 527 fn. 2 (Cel-Tech).) We therefore adopt that nomenclature and hereafter refer to these sections as the "UCL."
[4] At oral argument on the demurrer, the primary focus of Olszewski's argument was that the court should grant her leave to amend the complaint to assert two new theories of liability. First, she argued that even if a June 1997 letter and policy statement from the federal Health Care Financing Administration (the HCFA letter) correctly concluded that statutes such as section 14124.791 could be consistent with federal Medicaid rules if certain conditions were satisfied, her complaint could be amended to assert that respondents' practices violated the terms and conditions outlined in the HCFA letter. Second, she argued that her complaint could be amended to allege that respondents' practices violated the contractual obligations respondents owed to the California Department of Health Services. We evaluate below Olszewski's argument that the trial court abused its discretion by denying her request for leave to amend.
[5] An identical ban on balance billing applies to providers obtaining reimbursement directly from the federal government, rather than from a state-run program like California's Medi-Cal program. Under title 42 United States Code section 1395cc, subd. (a)(1), "Any provider of [Medicare] services . . . shall be qualified to participate under this subchapter and shall be eligible for payments under this subchapter if it files with the Secretary an agreement(A) not to charge . . . any individual or any other person for items or services for which such individual is entitled to have payment made under this subchapter ... or for which such provider is paid...." This statute has been interpreted to bar hospitals that have been paid by Medicare from placing liens on settlements or judgments obtained by patients from third parties. (Rybicki v. Hartley (1st Cir.1986) 792 F.2d 260, 261-262; Holle v. Moline Public Hosp. (C.D.Ill.1984) 598 F.Supp. 1017, 1021.)
[6] The ban against a provider collecting anything from the patient is subject to minor exceptions not pertinent here. (42 U.S.C. § 1396a, subd. (a)(25)(C)(i)-(ii).) It is also subject to the exception that the state may seek to recoup Medicaid payments from third parties under circumstances not relevant here.
[7] Although the language of the 1992 version of section 14124.791, subdivision (a) changed from its 1985 predecessor, the substantive impact on the parties appears to be unchanged. The 1985 version permitted a lien only when there was a balance owed above the amounts paid by Medi-Cal, and the extent of the provider's lien was for "the amount of unpaid charges." However, under the statutory scheme in effect in 1985, the state could assert its own lien to recover the amounts paid by Medi-Cal. (Palumbo v. Myers, supra, 149 Cal.App.3d at pp. 1029-1030, 197 Cal. Rptr. 214.) The net effect of the 1985 version was to create two liens, one in favor of the state and a second in favor of the provider, the total amount of which equaled the full amount of the services rendered by the provider. Although the 1992 version eliminates the balance owed language from the 1985 version, it conditions the right to recover on the lien on reimbursement to Medi-Cal (thereby eliminating any basis for a state lien) but grants the provider a lien for the full amount of the services. Thus, under either version, the patient's recovery from the third party was subject to a lien or liens covering the full amount of the services by the provider.
[8] Olszewski's preemption argument apparently relies on the conflict test for preemption. Olszewski makes no claim of field preemption and, as respondents persuasively point out, a congressional intent to entirely occupy the field from which we might imply an intent to preempt state regulation in that field is inconsistent with a Medicaid scheme that not only contemplates but requires state regulation of its Medicaid program. Although Olszewski attempts to construct an express preemption argument, this argument merely recasts her conflict argument. Olszewski cites Medicaid's express mandate that a state Medicaid plan must comply with federal law to show Congress expressly intended to preempt state law that does not comply or is inconsistent with the dictates of federal law. However, she supports her express preemption argument by asserting that "in every case in which there has been a challenge to state law as inconsistent with the federal mandates, the courts have either found the state law to be preempted, or found that no actual conflict existed." It is apparent from her argument and the cases on which she relies that the issue is not one of express preemption but is instead whether the state law is preempted because it conflicts with Medicaid law.
[9] Olszewski appears to claim that, even if section 14124.791 is viewed as a substitute billing statute, permitting providers to pursue the third party for payment would still conflict with federal laws and regulations because under federal law only the state agency administering the Medicaid program is authorized to pursue reimbursement from third parties for the costs of medical care provided to patients. Although numerous federal statutory provisions specify the state plan for administering its Medicaid program must provide mechanisms for the state to seek out and pursue reimbursement from responsible third parties (see, e.g., 42 U.S.C. § 1396a(a)(25), subsections (A), (B) and (H); see also 42 U.S.C. § 1396k), nothing in those rules expressly or impliedly prohibits a state from enlisting private providers to implement those mandates.
[10] The Evanston Hospital court, rejecting the provider's claim that it was proper to reimburse Medicaid and pursue the patient because Medicaid is only a "payor of last resort," stated at page 543: "Even if there were a payor-of-last-resort requirement in Medicaid law, it could not have the meaning plaintiff proposes because there will always be some possibility that an indigent patient will emerge victorious in a future lawsuit, win the lottery, strike gold, or land a good job and save some money. Under plaintiff's reading of Medicaid law, no state administrative agency could ever qualify as a Medicaid payor of last resort because alternative sources of reimbursement might later emerge."
[11] When a court is asked to defer to a federal agency's construction of the statutes it administers, the court "is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." (Chevron U.S.A. v. Natural Resources Defense Council (1984) 467 U.S. 837, 842-843, fns. omitted, 104 S.Ct. 2778, 81 L.Ed.2d 694 [judiciary is the final authority on issues of statutory construction and must reject administrative constructions contrary to clear congressional intent].) However, administrative opinions or interpretations that are not contained in formal regulations, or are otherwise not the product of a formal rule-making and notice and comment process, are not accorded Chevron-sty]e deference. (Christensen v. Harris County (2000) 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 ["Interpretations such as those in opinion letters ... do not warrant Chevron style deference.... Instead [they] are `entitled to respect' ... but only to the extent that those interpretations have the `power to persuade'"].) Olszewski argues the HCFA letter does not qualify for Chevron-style deference because it is not contained in a formal regulation, and was not the product of a formal rule-making and notice and comment process. (Cf., Pottgieser v. Kizer (9th Cir.1990) 906 F.2d 1319, 1323; Citizens Action League v. Kizer (9th Cir.1989) 887 F.2d 1003, 1007.) Because section 14124.791 does not satisfy the conditions for valid state statutes outlined in the HCFA letter, it is unnecessary to resolve this subsidiary issue.
[12] The HCFA letter recognized a tort plaintiff's recovery will often contain elements compensating the patient for losses other than the costs incurred for medical services, including pain and suffering, and loss of consortium. To this list, we add that the award could include lost income or property damage unrelated to the medical expenses component of the award. To comply with the core policy of prohibiting providers from pursuing money awarded to the patient, the HCFA letter specifies "the provider lien must be against the tortfeasor and not the general assets of the [patient], e.g., the provider would be entitled to reimbursement from a tort judgment or settlement when the [the recovery] specifically designates a set amount of money for medical expenses and then only if this amount is above the amount owed to Medicaid. The provider could be reimbursed only if the money has not been allotted to the beneficiary in a court judgment or settlement."
[13] We recognize that, when a Medicaid-eligible patient is injured by a third party tortfeasor, the ban on balance billing confers a windfall at the expense of the provider, although the recipient of that windfall differs from state to state. In those jurisdictions where the Hanif limitation does not apply and the patient is entitled to recover the actual value of the medical expenses, it appears that the patient is the beneficiary of the windfall. In California, however, it is the third party tortfeasor that benefits from the impact of the Hanif limitation, because he avoids liability for the full amount of medical expenses based on the patient's eligibility for Medi-Cal. Nothing in our opinion should be taken as suggesting that federal Medicaid law would preclude a state from seeking to remedy this anomaly, as for example by a statutory direct cause of action in favor of the provider against the third party tortfeasor; we conclude only that section 14124.791 does not survive federal preemption.
[14] The issue in Cel-Tech was whether below-cost sales of cellular phones violated the UCL. It noted that nothing in Business and Professions Code sections 17043 and 17044 provided a safe harbor for below-cost sales if the seller did not have the purpose of injuring competitors or destroying competition, because those provisions neither outlawed nor affirmatively permitted all nonpurposeful below-cost sales. However, it noted that Business and Professions Code section 17026.1, subdivision (a)(2) did provide a safe harbor by specifically authorizing below-cost sales when the sales were "a good faith endeavor to meet the legal market prices of competitors in the same locality or trade area." Because the statute stated such sales "shall be permitted," Cel-Tech concluded the language "shows the Legislature affirmatively permitted, i.e., made lawful, these good faith sales." (Cel-Tech, supra, 20 Cal.4th at pp. 187-188, 83 Cal. Rptr.2d 548, 973 P.2d 527.) The court therefore concluded that, to the extent the defendant's conduct was authorized by Business and Professions Code section 17026.1, a court could not deem that conduct unfair under the UCL.
[15] Although we have found no direct precedent in this area, analogous considerations led the court in Moss v. Superior Court (1998) 17 Cal.4th 396, 71 Cal.Rptr.2d 215, 950 P.2d 59 to conclude that a party who had structured his conduct in reliance on existing law should not be sanctioned merely because a later judicial decision changed that existing law. In Moss, a parent was unable to pay court-ordered child support because he willfully did not seek and obtain employment during a time when the law suggested no contempt sanction was available for his failure to pay support. The Moss Court concluded the prior law was incorrect and held a parent could be exposed to a contempt sanction if his or her inability to pay court-ordered child support was caused by willful failure to seek and obtain employment. (Id. at pp. 400-401, 71 Cal.Rptr.2d 215, 950 P.2d 59.) However, the court declined to give retroactive application to its holding, reasoning that due process precluded retroactive application of its ruling, stating that, "Like retroactive application of an `unforeseeable and retroactive judicial expansion of a statute [citation], retroactive application of a decision disapproving prior authority on which a person may reasonably rely in determining what conduct will subject the person to penalties, denies due process." (Id. at p. 429, 71 Cal.Rptr.2d 215, 950 P.2d 59.) Similarly, a private party should not be exposed to liability or sanctions for unfair business practices when he or she reasonably relied on prior law to decide how to conduct his or her business affairs.
[16] Olszewski also asserts the privilege applies only to communications by "participants authorized by law" (LiMandri v. Judkins, supra, 52 Cal.App.4th at p. 345, 60 Cal.Rptr.2d 539), and because section 14124.791 is preempted by federal law, any party asserting a lien under section 14124.791 necessarily is not a person authorized by law to assert a lien claim. We reject that argument for the same reasons previously discussed: a private party who engages in statutorily authorized conduct should not be required to forfeit the legal protections conferred on him by that statute, and become exposed to the damages and penalties available in tort actions, merely because he did not foresee that the statute on which he relied would be judicially invalidated.
[17] Here, the only wrongful collection activity alleged by Olszewski is that respondents asserted their lien rights. In contrast, LiMandri noted the defendant's wrongful conduct included, but was not limited to, the assertion of the lien, because the wrongful conduct included knowingly creating a security interest in the recovery that conflicted with the attorney's prior security interest, and inducing the clients to breach their fee agreement with the attorney. (Id. at p. 344, 60 Cal. Rptr.2d 539.) LiMandri is additionally distinguishable because, unlike a provider authorized by section 14124.791 to file a lien in a pending or nascent lawsuit, the defendant was not an authorized participant in the underlying litigation. Finally, LiMandri is distinguishable because a provider authorized by section 14124.791 to file a lien has an interest to be adjudicated in the personal injury lawsuit (Ghazarian v. Wheeler (1997 CD.Cal.) 177 F.R.D. 482, 486-487 [a section 14124.791 lien claimant has a sufficient interest related to the subject of the action to support intervention as of right]), and the LiMandri court concluded the lender's lien was unrelated to accomplishing any of the purposes of the underlying lawsuit. Olszewski does not occupy a position similar to that of the plaintiff in LiMandri.
[18] Olszewski did not file a copy of the current contract between ScrippsHealth and the State of California, but instead submitted the 1983 and 1992 versions of the contract in support of her request for leave to amend. She posited that the current contract is likely similar to those earlier contracts. However, it is undisputed that those contracts were executed before the current version of section 14124.791 was enacted by the Legislature, and therefore would not reflect the additional remedies conferred on a Medi-Cal provider.
[19] For example, Olszewski's UCL cause of action alleged respondents unlawfully asserted liens against personal injury judgments and requested, among other relief, a "declaration of the rights, remedies and obligations of the parties." Her prayer for relief similarly sought an order "declaring that all lien claims by defendants .. . are unlawful, unenforceable, and [uncollectable], and [ ] voiding such lien claims."