*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0260p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

SPECTRUM HEALTH CONTINUING CARE GROUP,
　　　　　　　　　　　*Plaintiff-Appellee/*
　　　　　　　　　　　*Cross-Appellant,*

　　　*v.*

ANNA MARIE BOWLING IRREVOCABLE TRUST
DATED JUNE 27, 2002,
　　　　　　　　　　　*Defendant-Appellant/*
　　　　　　　　　　　*Cross-Appellee.*

Nos. 04-1486/1541

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 03-00383—Gordon J. Quist, District Judge.

Argued: April 20, 2005

Decided and Filed: June 14, 2005

Before: NELSON and MOORE, Circuit Judges; RESTANI, Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:** Thomas M. Slavin, Bloomfield Hills, Michigan, for Appellant. Kristi R. Gauthier, MILLER, SHPIECE & TISCHLER, Southfield, Michigan, for Appellee. **ON BRIEF:** Thomas M. Slavin, Bloomfield Hills, Michigan, Mary T. Schmitt-Smith, Michael C. Gibbons, Roxanne J. Chang, BEIER & HOWLETT, Bloomfield Hills, Michigan, for Appellant. Kristi R. Gauthier, Wayne J. Miller, MILLER, SHPIECE & TISCHLER, Southfield, Michigan, for Appellee.

　　　MOORE, J., delivered the opinion of the court, in which RESTANI, J., joined. NELSON, J. (pp. 14-18), delivered a separate opinion concurring in part and dissenting in part.

_____

**OPINION**

_____

　　　KAREN NELSON MOORE, Circuit Judge. Defendant-Appellant, Anna Marie Bowling Irrevocable Trust Dated June 27, 2002 (the "Trust"), appeals the district court's grant of summary judgment in favor of Plaintiff-Appellee, Spectrum Health Continuing Care Group ("Spectrum").

---

[*] The Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

The district court found that Spectrum's lien on the proceeds of a malpractice settlement was valid and enforceable, despite the fact that Spectrum already had accepted Medicaid payments for the care provided to Anna Marie Bowling ("Bowling"). In its appeal, the Trust argues that the lien violates Medicaid's balance-billing prohibition, and therefore is invalid. In its cross-appeal, Spectrum argues that the issue of the validity of the lien is precluded by two prior state-court judgments approving the malpractice settlement. Upon review, we conclude that the issue is not precluded by either of the state-court judgments, and that the lien on the settlement is prohibited by federal and state Medicaid law. Therefore, we **REVERSE** the district court's grant of summary judgment in favor of Spectrum and **REMAND** the case with instructions to the district court to enter judgment in favor of the Trust.

## I. BACKGROUND

The material facts in this case are undisputed. On November 17, 1997, while undergoing surgery in a New York hospital, Bowling suffered a severe anoxic brain injury due to the improper administration of anesthesia. As a result of her injury, Bowling has little or no control of her limbs and is unable to speak. She requires twenty-four hour assistance with all daily activities. Bowling filed a medical-malpractice suit against the anesthesiologist and the hospital in the State of New York through her trial attorney, Joseph Dubinsky ("Dubinsky"), with Linda Ershow-Levenberg ("Ershow-Levenberg") serving as guardian ad litem in the suit.

Following the injury, Bowling sought long-term care in Grand Rapids, Michigan, where her sister resides. Spectrum is the parent company of a group of providers of sub-acute rehabilitation and nursing services, including Spectrum Health Continuing Care Center, formerly known as Grand Valley Health Center ("GVHC"). Spectrum agreed to admit Bowling to GVHC on the condition that Bowling's representatives provide written acknowledgment of a lien on the proceeds of a settlement or verdict in the malpractice suit to cover her medical costs. On November 24, 1998, Dubinsky sent a letter to Spectrum's counsel acknowledging "a lien on the proceeds owed Anna Bowling and/or her estate obtained either by settlement or verdict in the [malpractice] lawsuit." Joint Appendix ("J.A.") at 18 (Letter from Dubinsky to William Miller 1 (Nov. 24, 1998)). Ershow-Levenberg, Bowling's guardian ad litem in the malpractice suit, also signed the letter acknowledging the lien.

Bowling was admitted to GVHC in December 1998, where she remained until September 23, 2002. In April 1999, she became eligible to receive benefits from Michigan's Medicaid program. "Anticipating delay in realizing its lien on the medical malpractice lawsuit," Spectrum applied for and accepted Medicaid payments for Bowling's care. J.A. at 14 (Compl. at 3). Specifically, GVHC received $101,021.86 from Medicaid for services provided to Bowling from May 1999 through September 2002, along with monthly Medicaid co-payments from Bowling's representatives of $45,233.87. The total customary cost of Spectrum's services provided to Bowling during the time she resided at GVHC was $639,594.67, leaving a shortfall of approximately $538,572.81.[1] J.A. at 20-21 (Spectrum Chart of Monthly Charges).

On July 18, 2002, the parties in Bowling's medical-malpractice suit reached a settlement agreement. That same day, the Probate Court of Kent County, Michigan, entered a protective order approving the settlement and establishing the Trust for Bowling's benefit. On October 9, 2002, the

---

[1]It is unclear from the record how Bowling's co-payments factor into the shortfall. Spectrum states that its total customary cost was $639,594.67, of which Medicaid paid $101,021.86, leaving a shortfall of $538,572.81. That value does not take into account Bowling's Medicaid co-payments of $45,233.87, which would reduce the shortfall to $493,339.01. In addition, the Trust states, without citation to anywhere in the record, that Bowling's private insurance paid Spectrum an additional $60,000, which should further reduce the shortfall. Appellant's Br. at 8 n.2.

Supreme Court of the State of New York approved the settlement in the malpractice suit which included "[p]ayment of Anna Bowling's outstanding healthcare liens." J.A. at 88 (N.Y. Sup. Ct. Order at 3). Specifically, the court allocated the lump-sum amount to the various healthcare liens, including $575,000 to GVHC. The amount reflected the shortfall between Spectrum's customary cost for its services and the amount paid already by Medicaid. On February 23, 2003, pursuant to the settlement agreement, Dubinsky sent Spectrum a check for $575,000. Spectrum refunded $36,427.19 to the Trust to reach the proper shortfall amount of $538,572.81. The settlement proceeds were also used to reimburse Michigan's Medicaid agency approximately $104,719.68.

Co-trustees of the Trust later objected to the payment of funds from the settlement proceeds to Spectrum on the ground that federal and state law prohibit a service provider from receiving additional money for services which have already been paid for by Medicaid. The parties agreed to place the disputed amount in an interest-bearing trust account pending resolution of the issue. On May 5, 2003, Spectrum filed a declaratory judgment action against the Trust in the Circuit Court of Kent County, Michigan, seeking to clarify its right to enforce the lien. Pursuant to 28 U.S.C. § 1441, the Trust removed the action to the United States District Court for the Western District of Michigan and filed a counterclaim alleging that federal Medicaid law renders the lien invalid and unenforceable when the lien holder has already accepted Medicaid payments for the services provided. The parties filed cross motions for summary judgment on their respective declaratory judgment claims.

On February 20, 2004, the district court issued its opinion. First, the court held that the issue of the validity of the lien was not precluded by either of the state-court decisions approving the malpractice settlement. Under both Michigan and New York law, the court found that the requirements for issue preclusion had not been met. Second, the court held that under federal and state Medicaid law, the lien was valid and enforceable. The district court held that the additional money was recovered not from the beneficiary, but rather from the third-party tortfeasor, and therefore the recovery was not prohibited by the balance-billing prohibition. Moreover, the lien only attached to the portion of the award specifically allocated for medical expenses, and therefore did not interfere with Bowling's personal property. As a result, the district court entered summary judgment in favor of Spectrum. Both parties appeal from the district court's ruling.

## II. ANALYSIS

### A. Standard of Review

"We review the district court's summary judgment determinations under Federal Rule of Civil Procedure 56 *de novo*." *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 243 (6th Cir. 2004). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "For cross-motions for summary judgment, we must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Beck v. City of Cleveland*, 390 F.3d 912, 917 (6th Cir. 2004) (internal quotation omitted). We have noted, however, that "[t]he filing of cross-motions for summary judgment does not necessarily mean that an award of summary judgment is appropriate." *Id.*

**B.  Issue Preclusion**

We first consider whether summary judgment in Spectrum's favor is proper on the ground that the doctrine of issue preclusion bars the Trust's declaratory judgment claim.  Because we

conclude that Spectrum has failed to meet the requirements for issue preclusion under both Michigan and New York law, we affirm the district court's ruling on this ground.

The Full Faith and Credit Act mandates that "judicial proceedings . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken." 28 U.S.C. § 1738. The United States Supreme Court has interpreted the act as requiring that "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). In this case, Spectrum argues that the Michigan and New York state-court judgments approving the malpractice settlement preclude the Trust's declaratory-judgment claim. Accordingly, we must examine the laws of each of the respective states to resolve Spectrum's argument.

### 1. Issue Preclusion Under Michigan Law

Under Michigan law, issue preclusion, known as collateral estoppel, "precludes relitigation of an issue in a subsequent, different cause of action between the same parties where the prior proceeding culminated in a valid, final judgment and the issue was . . . actually litigated, and . . . necessarily determined." *People v. Gates*, 452 N.W.2d 627, 630 (Mich.), *cert. denied*, 497 U.S. 1004 (1990). "[T]he party asserting preclusion bears the burden of proof." *United States v. Dominguez*, 359 F.3d 839, 842 (6th Cir.), *cert. denied*, 125 S. Ct. 261 (2004). Therefore, to prove preclusion, Spectrum must demonstrate that:

1) the parties in both proceedings are the same or in privity,
2) there was a valid, final judgment in the first proceeding,
3) the same issue was actually litigated in the first proceeding,
4) that issue was necessary to the judgment, and
5) the party against whom preclusion is asserted (or its privy) had a full and fair opportunity to litigate the issue.

*Id.* (citing *Gates*, 452 N.W.2d at 630-31). In this case, the district court found that preclusion was inappropriate because Spectrum failed to meet several of the preclusion requirements. Upon review, we conclude that Spectrum has not satisfied any of the last three requirements, and therefore, is not entitled to preclusion under Michigan law on this issue.

First, Michigan courts have held that "[a] question has not been actually litigated until put into issue by the pleadings, submitted to the trier of fact for a determination, and thereafter determined." *VanDeventer v. Mich. Nat'l Bank*, 432 N.W.2d 338, 341 (Mich. Ct. App. 1988). The courts have held that an issue which was uncontested or indirectly referenced in the prior judgment was not actually litigated for collateral estoppel purposes. *See, e.g., Lichon v. Am. Universal Ins. Co.*, 459 N.W.2d 288, 295 (Mich. 1990) (holding that an underlying issue was not actually litigated in a prior criminal trial where the party entered plea of nolo contendere); *Cogan v. Cogan*, 385 N.W.2d 793, 795 (Mich. Ct. App. 1986) (holding that issue of paternity was not actually litigated in the original divorce proceeding which awarded child support).

Applying those principles to this case, we conclude that Spectrum has failed to demonstrate that the validity of its lien was actually litigated in the Michigan proceeding. Bowling was simply seeking a protective order to certify that the settlement was in her best interest and to establish the Trust. While approval of the whole settlement necessarily encompasses Spectrum's lien, there is no evidence in the record that the lien was ever specifically challenged or Medicaid's balance-billing prohibition ever raised. Spectrum's lien was never mentioned specifically in the order. The court only referenced the lien as part of the collective amount owed, noting that the settlement "provides

for payment of all liens associated with [Bowling's] medical care;" and that the settlement proceeds should be paid to the Trust "after satisfaction of the existing liens." J.A. at 99-100 (Mich. Prob. Ct. Order at 1-2). Therefore, because the specific issue was never put forth and determined by the trier of fact, we conclude that it was not actually litigated in the Michigan proceeding.

Furthermore, as the district court noted, the validity of Spectrum's lien was unnecessary to the determination that the malpractice settlement was in Bowling's best interest or to the establishment of the Trust. The probate court evaluated the settlement pursuant to Michigan Court Rule 2.420, which requires prior court approval for settlements involving legally incapacitated individuals. The comment to the rule lists factors that a court should consider in reaching its decision, but does not include the validity of any liens on the settlement. *See* Mich. Ct. R. 2.420 Cmt. to 2002 Am. Moreover, in reaching its decision, the Michigan court assumed that the Spectrum lien was enforceable, yet still found the settlement to be in Bowling's best interest. If the lien was unenforceable and Spectrum was limited to the Medicaid payments, it stands to reason that the benefits of the settlement agreement to Bowling would not be diminished because the Trust would, at the least, receive the amounts specifically allocated to it. Therefore, we conclude that the enforcement of Spectrum's lien was not necessary to the judgment in the Michigan proceeding.

Finally, we conclude that the Trust did not have a full and fair opportunity to litigate the issue in the Michigan court. The issue of the enforcement of the lien was never raised before the probate court and was unrelated to the court's determination. Moreover, Spectrum was not a party to the action nor in privity with a party to the action in the Michigan court.[2] Therefore, the Trust never had a full and fair opportunity to challenge the enforcement of the lien in the Michigan proceeding.

Because Spectrum has failed to satisfy several of the collateral estoppel requirements under Michigan law, we conclude that the issue of the validity of the lien is not precluded by the Michigan court judgment.

## 2. Issue Preclusion Under New York Law

Under New York law, "[t]he doctrine of collateral estoppel precludes a party from relitigating an issue which has previously been decided against him in a proceeding in which he had a fair opportunity to fully litigate the point." *Kaufman v. Eli Lilly & Co.*, 482 N.E.2d 63, 67 (N.Y. 1985) (internal quotation omitted). Two requirements must be satisfied before the doctrine is invoked: "[f]irst, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination." *Id.* New York courts have noted, however, that collateral estoppel is "an equitable doctrine," "grounded on concepts of fairness and should not be rigidly or mechanically applied." *D'Arata v. N.Y. Cent. Mut. Fire Ins. Co.*, 564 N.E.2d 634, 636 (N.Y. 1990). "In the end, the fundamental inquiry is whether relitigation should be permitted in a particular case in light of what are often competing policy considerations, including fairness to the parties, conservation of the resources of the court and the litigants, and the societal interests in consistent and accurate results." *Staatsburg Water Co. v. Staatsburg Fire Dist.*, 527 N.E.2d 754, 756 (N.Y. 1988). Applying these principles, we conclude that under New York law collateral estoppel is inappropriate in this case.

---

[2]The district court also found that Spectrum could not satisfy the first requirement for collateral estoppel which requires mutuality. Spectrum argues that under more recent Michigan caselaw, mutuality is not required. We need not decide the issue however, because Spectrum has failed to satisfy three of the other four requirements for collateral estoppel under Michigan law.

First, Spectrum cannot demonstrate that the issue of approval of the settlement agreement in the New York proceeding is identical to the enforceability issue to be adjudicated in this case. New York courts have held that "[i]f the issue has not been litigated, there is no identity of issues between the present action and the prior determination." *Kaufman*, 482 N.E.2d at 68. Thus, to be given preclusive effect, the issue must have been "actually litigated, squarely addressed and specifically decided." *Ross v. Med. Liab. Mut. Ins.*, 551 N.E.2d 1237, 1237 (N.Y. 1990). "An issue is not actually litigated if, for example, there has been a default, a confession of liability, a failure to place a matter in issue by proper pleading or *even because of a stipulation*." *Kaufman*, 482 N.E.2d at 68 (emphasis added). Thus, where an issue is uncontested, such as an underlying point in a settlement agreement, the issue was not actually litigated in the prior proceeding and therefore is not precluded from a subsequent one. *Id.*; *see also Arizona v. California*, 530 U.S. 392, 414 (2000) (noting "that consent agreements ordinarily are intended to preclude any further litigation on the claim presented but are not intended to preclude further litigation on any of the issues presented" (internal quotation omitted)).

In this case, the matter before the New York state court was judicial approval of the settlement in the medical-malpractice suit. *See* N.Y. C.P.L.R. 1207 (requiring prior judicial approval for settlements involving legally incapacitated individuals). The issue to be resolved was the fairness of the overall settlement to Bowling, not the validity of any of the underlying liens. The New York court order approved the settlement agreement including the payment to Spectrum. *See* J.A. at 91 (N.Y. Sup. Ct. Order at 6). Specifically, the court resolved the issue of whether a payment of $575,000 out of the total settlement proceeds of $4.57 million was in Bowling's best interest. Because Spectrum's lien was never contested or questioned in that proceeding, the parties effectively stipulated to its validity for purposes of approving the settlement agreement. As a result, the issue was never "actually litigated, squarely addressed and specifically decided" in the New York proceeding. *Ross*, 551 N.E.2d at 1237.

Furthermore, the Trust lacked a full and fair opportunity to litigate the point. New York courts have held that a party did not have a full and fair opportunity where the point was not the focus of the prior proceeding, but only indirectly related to the material issues. *Liddle, Robinson & Shoemaker v. Shoemaker*, 768 N.Y.S.2d 183, 187 (N.Y. App. Div. 2003). As we stated above, the focus of the New York proceeding was the fairness of the $4.57 million settlement, not the validity of the individual liens. Moreover, Spectrum was neither a party nor in privity with a party to the proceeding. Therefore, we conclude the Trust did not have a full and fair opportunity to litigate the issue.

Because the issue of the validity of the Spectrum lien was not identical to the approval of the settlement and the Trust did not have a full and fair opportunity to litigate the point, we conclude that under New York law, collateral estoppel is inappropriate in this case.

## C. Balance-Billing Prohibition

Having determined that neither of the two state-court judgments preclude this action, we turn to the merits of the Trust's claim. In its motion for summary judgment, the Trust argues that Spectrum's lien on the settlement proceeds violates Medicaid's balance-billing prohibition, and therefore is invalid. Because we conclude that by accepting Medicaid payments Spectrum waived its right to its customary fee for services provided to Bowling, we reverse the district court's ruling on this ground.

In 1965, Congress established Medicaid through Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v, to provide medical care to low-income families and individuals. *Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207, 1210 (6th Cir. 1997). The Medicaid program is "based on a

scheme of cooperative federalism," *King v. Smith*, 392 U.S. 309, 316 (1968), in which a state elects to adopt a plan providing medical care to its low-income citizens in return for the federal government subsidizing the bulk of the plan's financial obligations. *Barney*, 110 F.3d at 1210. A state is not required to participate in the program, but once it chooses to do so, the state's plan must comply with federal statutory and regulatory standards. *Pa. Med. Soc'y v. Snider*, 29 F.3d 886, 888 (3d Cir. 1994); 42 U.S.C. §§ 1396a(b); 1396c. The State of Michigan elected to participate in the Medicaid program and therefore must comply with all aspects of federal law. *See* Mich. Comp. Laws Ann. § 400.105(1).

One of the federal statutory requirements is that a state plan must establish payment rates for the various services provided under the plan. 42 U.S.C. § 1396a(a)(30). The payment rates must be "consistent with efficiency, economy, and quality of care and . . . sufficient to enlist enough providers so that care and services are available under the plan." *Id.* A health-care provider is not required to participate in the Medicaid program, but rather voluntarily contracts with the state to provide services to Medicaid-eligible patients in return for reimbursement from the state at the specified rates. *Barney*, 110 F.3d at 1211; *Linton by Arnold v. Comm'r of Health & Env't*, 65 F.3d 508, 515 (6th Cir. 1995), *cert. denied*, 517 U.S. 1155 (1996). Though the Medicaid rates are typically lower than a service provider's customary fees, "medical service providers must accept the state-approved Medicaid payment as payment-in-full, and may not require that patients pay anything beyond that amount." *Barney*, 110 F.3d at 1210. Moreover, even when a third party is subsequently found liable for the Medicaid beneficiary's medical expenses, the service provider "may not seek to collect from the individual (or any financially responsible relative or representative of that individual) payment of an amount for that service." 42 U.S.C. § 1396a(a)(25)(C). The accompanying federal regulations mandate that a state "must limit participation in the Medicaid program to providers who accept, as payment in full, the amounts paid by the agency plus any deductible, coinsurance or copayment required by the plan to be paid by the individual." 42 C.F.R. § 447.15. Consistent with this federal regulation, service providers in the Michigan Medicaid program must "accept payment from the state as payment in full by the medically indigent individual for services received." Mich. Comp. Laws Ann. § 400.111b(14). Moreover, "[a] provider shall not seek payment from the medically indigent individual, the family, or representative of the individual for . . . [a]uthorized services provided and reimbursed under the program." *Id.* The restriction on a service provider prohibiting it from recovering the balance between its customary fee and the Medicaid payment is commonly referred to as the prohibition against "balance billing." *Palumbo v. Myers*, 149 Cal. App. 3d 1020, 1025 (Cal. Ct. App. 1983).

In this case, Spectrum is seeking enforcement of its lien on the settlement proceeds to recover $538,572.81, which it claims is the shortfall between its customary fee and the amount it already received from Medicaid. The Trust argues that the lien is balance billing and therefore, prohibited under the law. Upon review, we agree.

All the courts which have considered the issue of whether a service provider, who has already accepted a Medicaid payment, may recover additional sums after a patient has received damages in a personal injury lawsuit have denied the provider's claim. *See* Michael K. Beard, *The Impact of Changes in Health Care Provider Reimbursement Systems on the Recovery of Damages for Medical Expenses in Personal Injury Suits*, 21 Am. J. Trial Advoc. 453, 470 n.98 (1998). In *Evanston Hospital v. Hauck*, 1 F.3d 540, 542 (7th Cir. 1993), *cert. denied*, 510 U.S. 1091 (1994), a hospital provided a patient medical care in exchange for Medicaid reimbursement at the state's prescribed rates. After the patient was awarded a sizable judgment against a third-party tortfeasor, the hospital sought to return the Medicaid amount and sue the patient for its customary fee. *Id.* at 542. In upholding the dismissal of the hospital's suit, the Seventh Circuit stated:

> But Evanston Hospital was not "forced" to abandon its right to sue Hauck; no one coerced the hospital into cashing a [Medicaid] check from the taxpayers as partial reimbursement for Hauck's medical bills. Rather, the hospital could have simply forsaken Medicaid and taken its chances that Hauck would somehow come up with the money to pay the bills himself. By opting for reimbursement from Medicaid, Evanston Hospital bought certainty. It purchased a guarantee of partial payment in lieu of possibly full payment or possibly no payment at all . . . Evanston Hospital wants out of its agreement with Medicaid now only because its gamble, in retrospect, was unwise.

*Id.* The court explained that to permit recovery would be to transform Medicaid into "an insurance program for hospitals rather than for indigent patients," because the hospital "wants to be reimbursed when the patient is indigent and still retain the right to sue patients who later become solvent — a classic example of wanting to both have and eat cake." *Id.* at 544; *see also Mallo v. Pub. Health Trust*, 88 F. Supp. 2d 1376, 1387 (S.D. Fla. 2000) (holding that the balance-billing provision forces providers to make a calculated choice because once the provider has chosen Medicaid, it is "barred from billing the patient an amount in excess of the State's Medicaid disbursement").

Similarly, in *Palumbo v. Myers*, a physician sued a patient to recover the difference between his customary fee and the Medicaid payment after the patient received a sizable settlement from a third-party tortfeasor, which included an allocation for the full payment of the fee. 149 Cal. App. 3d at 1022. The California appellate court held that though the third-party liability provisions of the Medicaid statute provide for the government's recovery of its Medicaid expenditures, the prohibition against balance billing bars the physician's claim. *Id.* at 1030; *see also Lizer v. Eagle Air Med Corp.*, 308 F. Supp. 2d 1006, 1010 (D. Ariz. 2004) (holding that a provider, who has already accepted Medicaid, is prohibited from enforcing a lien against a third-party tortfeasor to recover its customary fee); *Olszewski v. Scripps Health*, 69 P.3d 927, 942 (Cal. 2003) (invalidating a state statute which authorized a provider to recover its customary fee through a lien against a judgment or settlement obtained by a Medicaid beneficiary against a third-party tortfeasor); *Pub. Health Trust v. Dade County Sch. Bd.*, 693 So. 2d 562, 566 (Fla. Dist. Ct. App. 1997) (holding that a state regulation which permits a provider to recover its customary fee after receiving a Medicaid payment is invalid under Supremacy Clause).

Applying these principles to this case, we conclude that the enforcement of Spectrum's lien on the proceeds of the malpractice settlement to recover the balance of its customary fee is prohibited by federal and state law. Spectrum provided Bowling with medical care from May 1999 through September 2002, in exchange for which it received $101,021.86 from Medicaid. Spectrum was not required to seek payment from Medicaid; instead, Spectrum could have provided its services in exchange for enforcing its lien, which was the original agreement between the parties. Having chosen to accept payment from Medicaid however, Spectrum abandoned all rights to further recovery of its customary fee from the lien. As we have stated, Medicaid is a contract between a service provider and the government, in which the Medicaid recipient is a third-party beneficiary. *Linton*, 65 F.3d at 520. By accepting the Medicaid payment, the service provider accepts the terms of the contract — specifically that the Medicaid amount is *payment in full*. 42 U.S.C. § 1396a(a)(25)(C); 42 C.F.R. § 447.15; Mich. Comp. Laws Ann. § 400.111b(14). "If this arrangement is not acceptable to [service providers], they should not take Medicaid money in the first instance." *Evanston Hosp.*, 1 F.3d at 543.

In its complaint, Spectrum states that it filed for Medicaid reimbursement because it was "[a]nticipating delay in realizing its lien on the medical malpractice lawsuit." J.A. at 14 (Compl. at 3). Nothing in the statute, however, allows for the program to be used as a financing entity, providing interest-free loans to service providers until the beneficiary's payment arrives. Congress

certainly never intended such a result. Moreover, Spectrum also used Medicaid as an insurance policy against an adverse outcome of the malpractice litigation. As Dubinsky noted in his letter acknowledging the lien, "in the world of litigation, no result can be guaranteed." J.A. at 19 (Letter from Dubinsky to Wayne Miller at 2 (Nov. 24, 1998)). Rather than risk the possibility of no recovery, Spectrum relied on the taxpayers to insure against a total loss. Similar to the Seventh Circuit, we reject the invitation to transform the Medicaid program "into an insurance program for hospitals rather than for indigent patients." *Evanston Hosp.*, 1 F.3d at 544.

Spectrum attempts to distinguish its case from the other cases cited above by arguing that its lien pre-existed the malpractice settlement and that the lien was voluntarily agreed to by Bowling's representatives. Appellee's Br. at 26-27. Relying on contract principles, Spectrum concludes that it should be entitled to the benefit of its bargain. The district court agreed with this reasoning, explaining that we have "blessed such pre-existing agreements between providers and patients."[3] J.A. at 137 (Dist. Ct. Op. at 25). The district court's reasoning however, omits the critical fact that there was a pre-existing agreement between Spectrum and the State of Michigan as well. If Spectrum had not received Medicaid payments, the lien would be enforceable against the Trust as a voluntary agreement entered into by willing parties, even though the patient was Medicaid-eligible. *Barney*, 110 F.3d at 1211. Once it accepted the Medicaid payment, however, Spectrum had been paid in full for the services provided to Bowling. The mere fact that a prior voluntary agreement existed is without consequence.[4]

The district court attempted to distinguish this case by arguing that Spectrum was not seeking to recover from Bowling or the Trust, but rather from the third-party tortfeasor alone. The dissent also relies on this distinction, noting that federal law only prohibits a service provider from seeking "to collect from the individual (or any financially responsible relative or representative of that individual) payment of an amount for that service." 42 U.S.C. § 1395a(a)(25)(C). Similarly, Michigan law states that "[a] provider shall not seek payment from the medically indigent individual, the family, or representative of the individual." Mich. Comp. Laws Ann.

---

[3]In support of this statement, the district court cited our opinion in *Barney* in which we stated that "Medicaid providers may not bill patients for treatment under the program unless they have explicitly agreed prior to treatment that the patient will personally be liable, even if the providers themselves cannot get reimbursement from the state." 110 F.3d at 1211. Spectrum also relies on the quoted statement from *Barney* in support of its argument that the lien should be enforced. Appellee's Br. at 43. Both the district court and Spectrum read our statement in *Barney* beyond its appropriate context however.

In *Barney*, we were referring to a provision under Ohio law which states that a Medicaid provider is "not required to bill the [state plan] for medicaid-covered services rendered to eligible consumers." Ohio Admin. Code § 5101:3-1-13.1(C). Instead, the service provider may bill the consumer directly if "[t]he consumer is notified in writing prior to the service being rendered that the provider will not bill the [state plan] for the covered service; and . . . [t]he consumer agrees to be liable and signs a written statement to that effect prior to the service being rendered." *Id.* Thus, the statement in *Barney* stands for the unremarkable proposition that parties may elect to contract for services outside of the Medicaid scheme even though the services provided are otherwise covered by Medicaid and the consumer is Medicaid-eligible. The *Barney* statement does not apply to a situation as in this case, where the service provider both contracted with the consumer for medical services *and* billed Medicaid for those same services.

[4]At oral argument, Spectrum also claimed that the balance of equities favors enforcing the lien because Dubinsky used Spectrum's customary fee to obtain a larger settlement in the medical-malpractice suit. Spectrum argues that it would be unfair to allow a party to negotiate a settlement amount based on the validity of the lien and then later claim the lien is unenforceable. We find this argument to be equally unpersuasive. First, there is no evidence in the record that Spectrum's customary fee necessarily increased the settlement amount. Indeed, had Dubinsky not used Spectrum's customary fee in the negotiations, the estimate of the medical expenses incurred could have been substantially larger. Second, it was Spectrum's *choice* to apply for and accept Medicaid payments, and thereby implicate Medicaid's balance-billing prohibition. Spectrum's claim that the Trust is a bad actor seeking to renege on a promise is without merit. A party is not entitled to the benefit of its bargain when enforcement of that bargain would violate federal and state law.

§ 400.111b(14). Citing the California Supreme Court's decision in *Olszewski v. Scripps Health*, the dissent reasons that because the settlement allocated a portion of the proceeds for payment of the lien, enforcement is not prohibited by the balance-billing prohibition. In further support of this reasoning, Spectrum cites the Eighth Circuit's recent decision in *Ahlborn v. Ark. Dep't of Human Servs.*, 397 F.3d 620, 627 (8th Cir. 2005), for the proposition that a portion of a settlement award may be recoverable if specifically allocated for medical expenses. Upon review, we conclude this argument is unpersuasive as well.

First, while the dissent is correct that the federal and state statutes only mention attempts to recover from the individual or his or her representative, Spectrum's lien on the settlement proceeds *is* seeking recovery from Bowling for her medical care, and therefore falls within this prohibition. Despite the line item allocation to Spectrum in the settlement agreement, Spectrum was not a party to the medical malpractice suit and the settlement allocation is not its property. Similarly, once the settlement has been approved, the settlement proceeds are no longer the property of the tortfeasor either. Instead, the entirety of the settlement, regardless of how it is allocated, belongs to Bowling; Spectrum's lien is merely an encumbrance upon that property.[5] *See* Black's Law Dictionary 933 (7th ed. 1999) (defining a lien as "[a] legal right or interest that a creditor has in another's property, lasting usu[ally] until a debt or duty that it secures is satisfied"); *see also In re Approximately Forty Acres in Tallmadge Township*, 566 N.W.2d 652, 657 (Mich. Ct. App. 1997) ("A lien is a security interest for money owed by one party to another, and is separate from an underlying cause of action." (internal citation omitted)); *Aetna Cas. & Sur. Co. v. Starkey*, 323 N.W.2d 325, 328 (Mich. Ct. App. 1982) ("A lien is not a property right in, or right to, the thing itself, but constitutes a charge or security thereon."). Therefore, by seeking to enforce its lien, Spectrum is attempting to recover its customary fee from the Medicaid patient herself in clear violation of both federal and state law.

Furthermore, the federal and state statutes outlining Medicaid's balance-billing prohibition cannot be read in isolation. The federal regulation accompanying the statute explicitly limits participation in the Medicaid program to "providers who accept, as *payment in full*, the amounts paid by the agency." 42 C.F.R. § 447.15 (emphasis added). Similarly, the Michigan statute states that "a provider shall accept payment from the state as *payment in full* by the medically indigent individual for services received." Mich. Comp. Laws Ann. § 400.111b(14) (emphasis added). The clear import of these words is that the Medicaid payment is the total amount owed to the provider for the services rendered, and thus the provider "may not attempt to recover any additional amounts elsewhere." *Rehab. Ass'n of Va., Inc. v. Kozlowski*, 42 F.3d 1444, 1447 (4th Cir. 1994), *cert. denied*, 516 U.S. 811 (1995); *see also Lizer*, 308 F. Supp. 2d at 1009 ("This language prevents providers from billing *any* entity for the difference between their customary charge and the amount paid by Medicaid."). There is nothing in the statutes or regulations which suggests that a service provider may recover additional payment for those services.

---

[5]Spectrum's reliance on the Eighth Circuit's recent decision in *Ahlborn v. Ark. Dep't of Human Servs.*, 397 F.3d 620 (8th Cir. 2005), is also misplaced. *Ahlborn* involved a claim by the state for reimbursement for Medicaid payments from a personal-injury settlement. *Id.* at 621. Where a third party is liable for the cost of a Medicaid recipient's health care, federal law specifically assigns the state plan "the rights of such individual to payment by any other party for such health care items or services." 42 U.S.C. § 1396a(a)(25)(H). Federal law defines the assignment to the state as the right "to payment for medical care from any third party." 42 U.S.C. § 1396k(a)(1)(A). Recognizing that a settlement agreement often contains compensation for other expenses beyond simply medical care, the Eighth Circuit held that under these statutory provisions, the state's recovery is limited to the portion of the settlement allocated for medical expenses, even if that amount is below the actual cost incurred by the state. *Id.* at 627-28. The state may not recover from portions of the settlement not allocated for medical care. *Id.* at 628. Despite Spectrum's arguments to the contrary, *Ahlborn* does not stand for the proposition that allocated settlement proceeds are the property of the lienor rather than the tort victim.

The dissent concedes the reasonableness of this interpretation, but nevertheless reads into the law ambiguity where there is none in order to justify an alternative interpretation. In support of its argument, the dissent, like the district court below, relies heavily on a 1997 opinion letter from the Acting Director of the Medicaid Bureau of the Health Care Financing Administration ("HCFA"), which the California Supreme Court discussed in *Olszewski*:

> In the letter, the acting director stated that "[f]ederal law would not preclude the practice of providers pursuing payment in tort situations in excess of Medicaid reimbursement" as long as a state satisfies two conditions. First, the state must assure that Medicaid is made whole before the provider recovers any money. Second, the state must protect the assets of Medicaid beneficiaries by limiting provider recovery to the portion of the award specifically allocated for the beneficiary's medical expenses.

69 P.3d at 943. The dissent argues that there is "no reason to suppose that the Medicaid Bureau's clarification does not still represent agency policy, entitled to respectful consideration by the courts." Dissent at 16. Therefore, the dissent concludes that because the two conditions are met, the lien does not violate federal law. *But see Palumbo*, 149 Cal. App. 3d at 1022 (holding that a service provider was prohibited from collecting from a third-party tortfeasor even after Medicaid had been reimbursed and the settlement allocated funds for the full customary amount of medical expenses). We believe that such heavy reliance on this opinion letter in the face of clear statutory and regulatory language is misplaced.

First, the letter, dated June 9, 1997, is not included in the record. It is neither listed on the website for the Centers for Medicare & Medicaid Services, the successor to HCFA, nor published elsewhere. *See* http://www.cms.hhs.gov/states/letters/ (listing agency letters written to state officials from 1994-2004). Indeed, the lack of public availability alone raises doubts about whether this eight-year old opinion letter is still the policy of the federal government.

Moreover, the agency's letter is not entitled to judicial deference. The letter does not appear to be a product of the agency's rule-making authority, and therefore was likely not subject to the rigors of the public notice-and-comment process. *See United States v. Mead Corp.*, 533 U.S. 218, 230 (2001) (holding that agency action resulting from notice-and-comment rule-making or formal adjudications is entitled to judicial deference). Likewise, nothing in the Medicaid statutory scheme reveals that Congress intended that courts defer to the agency's opinion letters. *Id.* at 231 (noting that the absence of administrative formality does not necessarily bar judicial deference if Congress intended informal interpretations to have the force of law). Instead, as the Supreme Court has held, "[i]nterpretations such as those in opinion letters — like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law — do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000); *see also Wis. Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473, 497 (2002) (holding that the HCFA's interpretation of a federal statute outlined in a regional letter to state directors as well as a proposed rule only "warrants respectful consideration"). The sole exception to this rule is where an agency is seeking to interpret its own regulation, and the language of that regulation is ambiguous. *Christensen*, 529 U.S. at 588 (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)); *Beck*, 390 F.3d at 919. In this case, however, there is nothing ambiguous about the language of the federal regulation, which limits "participation in the Medicaid program to providers who accept, as payment in full, the amounts paid by the [state Medicaid agency]." 42 C.F.R. § 447.15. Moreover, the opinion letter does not serve to clarify anything about the language of that regulation, but instead authorizes reimbursement of a provider's customary fee from third-party tortfeasors. Thus, "[t]o

defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation."[6]  *Christensen*, 529 U.S. at 588.

Finally, the letter is inconsistent with the statutory scheme Congress enacted.  To the extent that a third party is liable for the medical expenses of a Medicaid beneficiary, federal law requires that the beneficiary assign his or her right to payment from the third party for medical expenses to the state Medicaid agency.  42 U.S.C. §§ 1396a(a)(25)(H), 1396k(a)(1)(A); *see also Ahlborn*, 397 F.3d at 625 (noting that the statutory scheme requires the state to be reimbursed for its Medicaid payments from third parties who are liable to the Medicaid beneficiary).  Thus, Congress clearly envisioned a scenario in which a third party would be liable to a Medicaid beneficiary for medical services, but specifically authorized recovery only to the state agency.  The absence of a statutory provision providing for recovery for service providers of their customary fee coupled with the language limiting service providers to Medicaid payments as payment in full, reinforces our conclusion that the approach in the 1997 opinion letter should not be adopted.  *See Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal citation omitted) (alteration in original)).

In sum, because we hold that the language of the federal regulation and Michigan law clearly limit service providers to the amount paid by the Medicaid agency as "payment in full," we decline to follow the 1997 letter's suggested approach.[7]  *See Christensen*, 529 U.S. at 588 (declining to adopt an agency interpretation of an unambiguous regulation).  Moreover, given the extremely detailed nature of the Medicaid scheme and the frequency with which it is amended, reliance on an

---

[6]By contrast, the district court below found that the "policy clarification letter is a policy directive entitled to considerable deference."  J.A. at 133 (Dist. Ct. Op. at 21 n.8).  The court cited *Elizabeth Blackwell Health Center For Women v. Knoll*, 61 F.3d 170 (3d Cir. 1995), *cert. denied*, 516 U.S. 1093 (1996), in support of its argument.  In *Elizabeth Blackwell*, the Third Circuit held that a letter to state Medicaid directors from the Director of the HCFA was entitled to "considerable weight."  *Id.* at 182.  The letter in that case both interpreted a federal statute as well as clarified one of HCFA's own regulations.  *Id.* at 177, 183.  To the extent that the Third Circuit's opinion in *Elizabeth Blackwell* can be read as deferring to an agency's policy letter regarding the interpretation of a federal statute, the Supreme Court has twice since that decision clarified the degree of judicial deference due to informal agency pronouncements.  *See Mead Corp.*, 533 U.S. at 235 (holding that tariff classification rulings by the United States Customs Service are only to be considered persuasive authority); *Christensen*, 529 U.S. at 587 (holding that an opinion letter written by the Department of Labor interpreting a statute is not entitled to *Chevron* deference).  More specifically, in the context of Medicaid, the Court has stated that the HCFA's interpretation of a federal statute outlined in both a regional state letter and a proposed rule is entitled to only "respectful consideration."  *Blumer*, 534 U.S. at 497.  Therefore, *Elizabeth Blackwell* is no longer the last word on this point.  As to the portion of the *Elizabeth Blackwell* letter that simply clarified an ambiguity in a previously promulgated rule, the HCFA letter in *Elizabeth Blackwell* is entitled to judicial deference under the *Auer* exception.  Because the regulation at issue in this case is unambiguous, this portion of the *Elizabeth Blackwell* opinion is not applicable to the case at bar either.

[7]Spectrum also relies on a letter from the Supervisor of the Casualty Unit in the Michigan Department of Community Health, in which she writes that "there is case law (no-fault) supporting a provider's right to payment of all charges when they have asserted a lien directly with the insurance company, even when they have also billed and received payment from Medicaid."  J.A. at 102 (Letter from Patricia Morscheck to Wayne J. Miller at 1 (Apr. 16, 2003)).  The letter does not provide any citations to a case in which a Medicaid provider has recovered its customary fee from a settlement with a tortfeasor.  Moreover, to the extent that Ms. Morscheck's opinion is relying on the reimbursement practice under the state's no-fault statute, it is inapposite to this case.  Michigan's no-fault statute specifically authorizes payment to providers of their customary charges.  *See* Mich. Comp. Laws Ann. § 500.3157 (requiring service providers to charge a reasonable amount not to exceed its customary charges); *Munson Med. Ctr. v. Auto Club Ins. Ass'n*, 554 N.W.2d 49, 53 (Mich. Ct. App. 1996) (holding that under the state's no-fault law, a service provider is entitled to customary charges it bills every patient treated rather than amount it accepts).  Finally, because we find the federal and state statutes to be clear, we need not rely on the guidance from the state agency official.

eight-year-old opinion letter paraphrased by the Supreme Court of California is unwarranted. If service providers should be permitted to recover their customary fees from a beneficiary's settlement with a third-party tortfeasor, it is solely within the province of Congress to allow it. For now, we will adhere to the clear language of the statute and the accompanying regulation. Therefore, the Trust is entitled to judgment as a matter of law.

### III.  CONCLUSION

In summary, we conclude that the issue of the validity of the lien is not precluded by either of the state-court judgments, and the lien on the settlement proceeds is prohibited by federal and state Medicaid law. Therefore, we **REVERSE** the district court's grant of summary judgment in favor of Spectrum and **REMAND** the case with instructions to the district court to enter judgment in favor of the Trust.

---

### CONCURRING IN PART, DISSENTING IN PART

---

DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part. I agree with my colleagues on the panel, and with the district court, that the doctrine of collateral estoppel does not bar Ms. Bowling's trust from challenging Spectrum's right to retain the funds earmarked for Spectrum in the judicially-approved settlement of the tort action. I respectfully disagree with the majority's conclusion that the tortfeasor's promise to compensate Spectrum for its services must be nullified and replaced by a judicially-created obligation to compensate Ms. Bowling's trust for Spectrum's services.

If the funds received by Spectrum pursuant to the settlement had come out of Ms. Bowling's pocket — as would have been the case if Spectrum had enforced its lien against settlement proceeds payable to Mrs. Bowling — it is clear that Spectrum would not have been entitled to keep the money. This is so because the relevant federal statute, 42 U.S.C. § 1396a(a)(25)(C), requires every state medical plan to provide that

> "in the case of an individual who is entitled to medical assistance under the State plan with respect to a service for which a third party is liable for payment, the person furnishing the service may not seek to collect *from the individual* (or any financially responsible relative or representative of the individual) payment of an amount for that service . . . ." (Emphasis supplied.)

The required prohibition is commonly termed a ban on "balance billing" — *i.e.*, a ban on "the practice of billing *patients* for the balance remaining on a medical bill after deducting the amount paid by [the state Medicaid program]." *Olszewski v. Scrippshealth*, 107 Cal. Rptr.2d 187, 192 (Cal. App. 2001), *aff'd in part and rev'd in part*, 69 P.3d 927 (Cal. S.Ct. 2003) (emphasis supplied).[1]

The structure of the federal statute suggests that the *Olszewski* courts' understanding of the scope of the required ban on balance billing is correct. After explicitly referring to the situation where "a third party is liable for payment," the statute conspicuously refrains from saying that the entity furnishing the service may not seek to collect from the third party. Instead, the statute simply says that the entity furnishing the service may not seek to collect "from the individual" — *i.e.*, from the patient.

Michigan law appears to be in accord. In compliance with the federal mandate for a balance-billing ban, Michigan has enacted Mich. Comp. Laws § 400.111b(14). This statute obligates a provider of medical services to meet the following requirement:

> "Except for copayment authorized by the state department . . . a provider shall accept payment from the state as payment in full *by the medically indigent individual* for services rendered. *A provider shall not seek payment from the medically indigent individual, the family, or representative of the individual* for . . . [a]uthorized services provided and reimbursed under the program." (Emphasis supplied.)

If the first sentence of § 400.111b(14) stood alone, it could be read in either of two ways. Standing alone, the sentence might mean that the state's settling of an indigent individual's medical

---

[1] This definition of balance billing was endorsed by the California Supreme Court in footnote 2 of its opinion, 69 P.3d at 931.

bill for (as here) something like 30 cents on the dollar would not only extinguish any liability on the part of the individual, it would also extinguish any third-party liability. Or the sentence might mean that acceptance of payment from the state would constitute payment in full as far as the individual is concerned — an interpretation that would leave open the possibility of the service provider's seeking payment of the balance from an unrelated third party.

It seems to me that the second sentence of § 400.111b(14) illuminates the meaning of the first sentence. What the second sentence says, to repeat, is that "[a] provider shall not seek payment *from the medically indigent individual* [or his family or representative] for . . . services provided and reimbursed under the program." (Emphasis supplied.) Like its counterpart in the federal statute, this sentence is silent as to collection efforts against an unrelated third party. Reading the two sentences together, as I think one must, I conclude that the first sentence in Michigan's balance-billing ban was intended to provide that payment by the state must be accepted as payment in full as far as the medically indigent individual is concerned.

But what of the regulations? Do the federal Medicaid regulations broaden the requirement for a ban on balance billing to require the state not only to insure that the entity providing the service "not seek to collect from the individual," but to require that the provider not seek to collect from anyone else either? Even though the service is one for which, in the words of the statute, "a third party is liable for payment"?

The bare language of the pertinent regulation, 42 C.F.R. § 447.15, unquestionably admits of this possibility. Departing from the structure of the statute, the regulation couches the requirement in these terms:

> "A State plan must provide that the Medicaid agency must limit participation in the Medicaid program to providers who accept, as payment in full, the amounts paid by the agency plus any deductible, coinsurance or copayment required by the plan to be paid by the individual."

It would not be unreasonable for a state Medicaid director to suppose that this language was intended to require that state plans unconditionally prohibit participating service providers from pursuing third-party tortfeasors for payment. See *Rehabilitation Services of Virginia v. Kozlowski*, 42 F.3d 1444, 1447 (4th Cir. 1994).[2] But in guidance provided to state Medicaid directors by the Health Care Financing Administration's Medicaid Bureau on June 9, 1997, the Medicaid Bureau explained that the agency had no such intent. "As long as States assure preservation of certain principles," the Medicaid Bureau told the states, "Federal law would *not* preclude the practice of providers pursuing payment in tort situations in excess of Medicaid's reimbursement . . . ." (Emphasis supplied.) See *Olszewski*, 107 Cal. Rptr.2d at 194-95, where the text of the Medicaid Bureau's policy clarification is quoted *in extenso*.

The Medicaid Bureau's policy clarification goes on to spell out in detail the conditions under which payment in excess of Medicaid's reimbursement can be pursued from tortfeasors:

> "Specifically, the State must assure that Medicaid is made whole before providers can keep any monies. The State must also prohibit providers from pursuing money

---

[2]In presenting an overview of the Medicare/Medicaid program, the *Kozlowski* court observed that "[s]ervice providers who participate in the Medicaid program are required to accept payment of the state-denoted Medicaid fee as payment in full for their services, *i.e.*, they are required to take assignment, and may not attempt to recover any additional amounts elsewhere." *Id*. at 1447. This statement was pure dictum; it had nothing whatever to do with the issue the court decided.

that has been awarded to the [patient]. In other words, the provider lien must be against the tortfeasor and not the general assets of the [patient], e.g., the provider would be entitled to reimbursement from a tort judgment or settlement when the settlement specifically designates a set amount of money for medical expenses and then only if this amount is above the amount owed to Medicaid. *The provider could be reimbursed only if the money has not been allotted to the beneficiary in a court judgment or settlement.* This would mean that if the lien were not perfected, the tortfeasor would stand to retain the money." *Id.* (Emphasis supplied.)

I am aware of no reason to suppose that the Medicaid Bureau's clarification does not still represent agency policy, entitled to respectful consideration by the courts. Indeed, in the California Supreme Court's *Olszewski* decision — a decision handed down more than a year after the parties to Ms. Bowling's malpractice action reached their settlement agreement and nearly four months after Spectrum's attorney received the $575,000 allotted to Spectrum in the settlement — the California court relied heavily on the policy clarification in holding that certain sections of California's Welfare and Institutions Code were in conflict with federal law. In a passage worth quoting in full, the court declared that the policy clarification is "entitled to considerable deference:"

> "[T]he June 9, 1997, policy clarification letter sent by the Acting Director of the Medicaid Bureau of the HCFA to all state Medicaid directors confirms that [Welf. & Inst. Code] sections 14124.791 and 14124.74 conflict with federal law. Where a federal regulation is ambiguous, 'an agency's interpretation of its own regulation is entitled to deference.' (*Christensen v. Harris County* (2000) 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (*Christensen*).) As 'the Secretary's attempt to give interpretive guidance to the states in advance of their submission of state Medicaid plans' (*Elizabeth Blackwell Center, supra*, 61 F.3d at p. 181, fn. omitted), this letter is a policy directive entitled to considerable deference (see *id.* at pp. 181-182 [according great deference to a policy directive issued by the Director of the Medicaid Bureau of the HCFA])." 135 Cal. Rptr.2d at 19-20 (footnote omitted).[3]

Under the factual circumstances presented in the case at bar, it does not appear to me that federal policy, as reflected in the pertinent statutory and regulatory law, precludes Spectrum from

---

[3]Prior to the Medicaid Bureau's issuance of its June 9, 1997, policy clarification, Florida's Medicaid agency adopted a regulation providing that when the agency has been made whole in respect of a payment of medical assistance, "any excess third-party benefits collected by a provider are permitted to be applied to provider charges that exceed Medicaid payment . . . ." Regulation 59 G-7.055(6), Fla. Admin. Code, as quoted in *Pub. Health Trust of Dade County, Fla. v. Dade Co. School Brd.*, 693 So.2d 562, 566 (Fla. Dist. Ct. App. 1997). "Clearly," the Florida court concluded, "this state administrative regulation is in direct conflict with federal Medicaid laws . . . ." *Id.* Perhaps the perceived conflict with federal Medicaid laws would have been less clear to the court if it could have known of the federal Medicaid Bureau's interpretation of the federal Medicaid laws.

Or perhaps not. The majority opinion in the case at bar makes a persuasive argument that the 1997 policy clarification letter, which was not the product of a notice-and-comment proceeding, is not, strictly speaking, entitled to "deference." What the letter is entitled to, I believe, is respectful consideration. And the message the letter conveys to me, at least, is that the agency which adopted the regulation codified at 42 C.F.R. § 447.15 did not intend the regulation to be taken as a blanket prohibition against healthcare providers seeking to be made whole by third-party tortfeasors in situations where the interests of the Medicaid beneficiary would not thereby be prejudiced. If the Supreme Court of the United States, in interpreting the work product of a coordinate branch of government, can engage in the type of humane statutory construction of which *Church of the Holy Trinity v. United States*, 143 U.S. 457 (1892), is a classic example, I am not sure that the Court would wish to bar administrative agencies from engaging in precisely the same sort of interpretation of their own regulations. Who is in a better position than the agency itself to know what the agency was or was not thinking of when it adopted a regulation the strict application of which, in occasional situations, would be patently unjust?

being fully compensated by the third party whose alleged malpractice gave rise to Ms. Bowling's need for the care Spectrum provided.  Among the relevant circumstances are these:

— it is undisputed that Michigan's Medicaid program was made whole by the tortfeasor's payment of $104,719.68 to the State of Michigan in satisfaction of Michigan's Medicaid healthcare lien;

— Spectrum received nothing out of the funds awarded to Ms. Bowling; and

— both the settlement and the judgment approving it "specifically designate[d] a set amount of money for medical expenses," to use the Medicaid Bureau's language, and "the money has not been allocated to the beneficiary in a court judgment or settlement."

I believe it is evident, in short, that Spectrum has not recovered anything from the patient.  In this respect there is a crucial difference between the present case and the many cases in which courts (including ours) have either said generally that healthcare providers may not require patients to pay anything beyond what Medicaid has paid or have held specifically that damages recovered by a Medicaid patient in a tort suit may not be reached by a service provider that accepted payment from Medicaid.  See, *e.g.*, *Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207, 1210 (6th Cir. 1997); *Evanston Hospital v. Hauck*, 1 F.3d 540, 542 (7th Cir. 1993), *cert. denied*, 510 U.S. 1091 (1994); *Mallo v. Public Health Trust*, 88 F.Supp.2d 1376, 1387 (S.D. Fla. 2000); *Lizer v. Eagle Air Med. Corp.*, 308 F.Supp.2d 1006, 1009-10 (D. Ariz. 2004).[4]

It is true that if the tort case had been settled on terms that called for a payment of money only to Ms. Bowling or her representatives, a lien asserted by Spectrum on the proceeds of such a settlement would have been a lien on Ms. Bowling's property.  As such, the lien would have been unenforceable.  But because the settlement — and the court order approving it — made a "line item" allocation to Spectrum for the value of the services provided, it was not Ms. Bowling's money that Spectrum received when the tortfeasor honored his contract (a contract of which I presume Spectrum was a third-party beneficiary) by paying Spectrum's bill.

We have no reason to suppose that the allocation of money to Spectrum reduced Ms. Bowling's recovery *pro tanto*, and we have good reason to suppose it did not.  Under the law of New York (the state where the injury occurred and where the alleged tortfeasor was sued), it is clear that Ms. Bowling never had a claim against the tortfeasor for the fair value of Spectrum's services.  New York does not follow the traditional collateral-source rule — and, applying New York statutory law, New York's highest court has held that a tort claimant may not recover as special damages the value of medical and nursing care furnished gratuitously. *Coyne v. Campbell*, 11 N.Y.2d 372, 183 N.E.2d 891 (1962).  Thus it was held in a recent New York intermediate appellate court case that where a hospital wrote off a $138,000 balance that remained on a $369,000 hospital bill after the hospital received partial payment from Medicaid and a no-fault insurer, the plaintiff in a wrongful death

_____

[4] In *Palumbo v. Myers*, 149 Cal. App.3d 1020 (1983), a divided intermediate appellate court in California held that even where a Medicaid patient's tort settlement allocated funds for the full payment of the treating physician's fee, the physician could not keep the money when paid by the tortfeasor.  The *Palumbo* decision turned, however, on a California statute that barred providers of health care services under the state's Medi-Cal program from recovering the cost of covered services from the patient "or any other person," subject to exceptions that were held not to include third-party tortfeasors.  See *id.* at 1023.  No such state statute has been called to our attention  here — and as far as federal law is concerned, the Supreme Court of California has now recognized that "federal statutes and regulations do not bar a provider from recovering from liable third parties . . . ." *Olszewski*, 135 Cal. Rptr.2d at 19.

action could not recover the write-off as an element of her damages.  *Kastick v. U-Haul Co. of Western Michigan*, 292 App.Div. 797, 740 N.W.S.2d 167 (2002).

The ramifications for the present case are obvious.  The New York trial attorneys who negotiated the settlement of Ms. Bowling's tort suit may not have been familiar with the intricacies — and uncertainties — of federal Medicaid law, but they must have been well aware of New York's version of the collateral source rule.  New York personal injury lawyers and New York defense counsel deal with this rule all the time.  I believe that these New York lawyers knew perfectly well, when they negotiated their multi-million dollar settlement, that Spectrum's bill for services could not be an element of Ms. Bowling's damages under New York law.  And they would probably be puzzled, as I am, about the source of this court's authority to rewrite their settlement agreement so that instead of compensating Spectrum for the services it provided, the defendant in the malpractice action will be paying the plaintiff several hundred thousand dollars to which New York law gives her absolutely no claim.

It seems clear to me, under the facts presented here, that Spectrum's collection of its bill from the tortfeasor cannot properly be viewed as a collection from the patient herself.  My colleagues on the panel having seen the matter differently, I respectfully dissent on this issue.